NATIONAL MEDICAL ENTERPRISES, INC. and Psychiatric Institutes of America, Inc. n/k/a NME Psychiatric Hospitals, Inc. and Ron Cronen, Relators,

v.

Honorable David C. GODBEY, Judge, Respondent.

No. 95–0401.

Supreme Court of Texas.

June 6, 1996.

Michael P. Carnes, Robert B. Krakow, Dallas, Robert H. Fairbank, Los Angeles, CA, Stacy L. Brainin, Arnold A. Spencer, Dallas, Craig Dummit, Los Angeles, CA, Barry F. McNeil, Austin, for relators.

Ronald L. Palmer, Larry D. Carlson, Samara L. Kline, Parks W. Bell, Dallas, Joe R. Greenhill, Austin, for respondent.

HECHT, Justice, delivered the opinion of the court in which PHILLIPS, Chief Justice, and GONZALEZ, CORNYN, SPECTOR, OWEN and ABBOTT, Justices, joined.

Two questions are raised by this original mandamus proceeding. One is whether a

lawyer is disqualified from representing plaintiffs in a lawsuit against a corporation if another lawyer in the same firm, who, while retained by the corporation to represent an ex-employee in matters substantially related to the lawsuit, received from the corporation information that he is obliged to treat as confidential. The other is whether, in the circumstances before us, the lawsuit against the corporation is adverse to the ex-employee though he is not named as a party. The district court answered both questions no. We disagree with the district court on a question of law and thus conclude that relators are entitled to relief by mandamus.

## I

National Medical Enterprises, Incorporated, Psychiatric Institutes of America, Incorporated, and other related entities, to which we refer collectively as NME, have for several years been targets of criminal investigations and defendants in civil lawsuits arising out of their operation of more than seventy psychiatric hospitals in Texas and across the United States. Broadly speaking, the accusations against NME have been that it mistreated psychiatric patients and defrauded their insurers, public and private, to obtain payment for treatment without medical justification. These charges, and the numerous criminal and civil cases they have spawned, have drawn widespread publicity. Psychiatric Institutes has pleaded guilty to federal criminal charges.

A corporation acts only through its human agents, but its liability for their misconduct does not absolve the agents from individual liability. The employees and former employees of NME who were involved in its alleged misconduct have faced the threat of personal liability, creating the potential for conflicts of interest between one employee and another, and between them and NME. For example, a former NME employee facing criminal indictment might choose, in exchange for immunity or a recommendation of leniency, to cooperate with law enforcement authorities, contrary to NME's interests or those of former co-workers. For persons in such circumstances, NME retained independent counsel to represent them at NME's expense, something not uncommon for employers in similar situations.

NME retained Ed Tomko, then with the law firm of Doke & Riley and later with the firm of Baker & Botts, to represent Ronald L. Cronen, who had been NME's regional administrator for Texas for eleven months before he left its employ, and who had previously been the administrator of a NME hospital in Texas. Tomko advised Cronen concerning criminal investigations into NME's activities and discovery in various related civil lawsuits. At the time Cronen's employment with NME terminated, he stated to NME under oath that he had not been involved in any wrongdoing. He has steadfastly maintained this position since, as have Tomko and Baker & Botts. Cronen has never been indicted and has never received a letter from law enforcement authorities stating that he was a target of investigation, but he has received information from time to time indicating that he was, and still is, within the scope of such investigations. Cronen's present attorney—not Tomko—testified:

> I have had numerous conversations with government agents and government attorneys regarding the scope of their investigation. The scope of the investigation is extremely broad, encompassing all aspects of [NME's] psychiatric hospital business including patient admission, billing, treatment and discharge and inducements to referral sources. Ron Cronen is considered to be a "target" of the investigation. Ron Cronen is at risk in the investigation by virtue of his position alone.

Cronen's immediate predecessor as Texas regional administrator, Peter Alexis, was indicted and pleaded guilty to federal criminal charges. Cronen was named a defendant in at least thirty-three civil lawsuits, but in each case the claims against him were dismissed. Tomko and Baker & Botts never represented Cronen in any lawsuit. No judgment has ever been rendered against Cronen, and he has never paid money to settle any claim, based upon his employment with NME.

NME also retained Tomko to provide legal counsel on similar matters to Dr. James Wicoff, formerly the Medical Director of NME's hospital in San Antonio. Wicoff, like Cronen,

was named as a defendant in several civil proceedings and was the subject of a federal grand jury investigation, but it does not appear that a judgment was ever rendered against him or that he was ever indicted.

Tomko represented Cronen and Wicoff for about a year. For the first seven months, before he joined Baker & Botts, he billed NME about $18,000 for his work. For the last five months he billed only about $700. Whether Tomko's work was sensitive in nature or significant in the scheme of things is disputed. What is undisputed, however, is that while Tomko represented Cronen and Wicoff he received confidential information not only from them but from NME as well in conferences and meetings at which a joint defense was discussed. Tomko has expressed doubt about whether the information was of much importance and whether it has not since been made public in all the various legal proceedings, but he has not denied that he has information from NME and Cronen that remains confidential. To the contrary, he has taken pains to prevent every lawyer at Baker & Botts, other than those assisting him, from obtaining any access to such information.

Tomko's discourse with NME, its employees and former employees, and their counsel was subject to a written joint defense agreement. (Although Cronen never signed the agreement, Tomko and Wicoff did, and Cronen and NME acknowledge that the same agreement applied to them.) By signing the agreement, Tomko agreed with NME and others who were parties to the following:

1. Unless expressly stated in writing to the contrary, any communications between or among any of the client members and/or the attorney members concerning the [investigations and litigation involving NME] are confidential and are protected from disclosure to any third party by the joint defense privilege, the attorney-client privilege and the work product doctrine.

. . . . .

3. None of the information obtained by any client member or attorney member pursuant to this agreement shall be disclosed to any third party without the consent of the attorney member who disclosed the information in the first instance.

. . . . .

6. Each client member understands and acknowledges ... that he or she is represented only by his or her own attorney in this matter; that while the attorneys representing the other members have a duty to preserve the confidences disclosed to them pursuant to this agreement, they will not be acting as his or her attorney in this matter; and that the attorney representing the other client members will owe a duty of loyalty to their own respective clients only. Each client member further understands and acknowledges that the attorney members representing other client members have the right, and may well have the obligation, to take actions against his or her own interest. . . .

Over NME's objections, Tomko and Baker & Botts withdrew from representing Cronen and Wicoff for reasons that have no bearing on any matter now before us. About seventeen months later, Baker & Botts lawyers who had not been involved in representing Cronen and Wicoff filed suit against NME on behalf of a large number of former patients at NME's psychiatric hospitals. *Kelly A., et al. v. National Medical Enterprises, Inc., et al.*, No. 94–10808 (160th D.Ct., Dallas County, Texas, filed Oct. 17, 1994). The current petition names more than ninety plaintiffs and summarizes their allegations as follows:

As a result of a fraudulent, illegal scheme devised and executed by the Defendants, Plaintiffs were lured or forced to psychiatric treatment centers operated for profit by the Defendants. Once confined there, Plaintiffs, mainly adolescents and children, some as young as six years old, were subjected to outrageous physical and mental abuse by Defendants. . . .

Defendants were motivated—not by a desire to provide competent and appropriate psychiatric care to Plaintiffs—but by greed. They typically admitted only patients who were well-insured and only for as long as their insurance lasted. By manipulating diagnoses and paying kickbacks to a network of referral doctors, Defendants were able to force Plaintiffs' confine-

ment in psychiatric hospitals and reap the reward of insurance benefits when there was no legitimate medical justification for such confinement. Defendants collected hundreds of millions of dollars from insurance companies duped into subsidizing services Defendants claimed to have provided and from taxpayers through fraudulent Medicare reimbursements. Defendants' unconscionable conduct and the greed that motivated [them] only recently have been exposed by Congress, state legislatures, law enforcement authorities and courts. In connection with the activities that are the subject matter of this lawsuit, Defendants have plead guilty to federal criminal charges of conspiracy and fraud and have admitted paying kickbacks in exchange for patient referrals. This lawsuit seeks recover of actual and exemplary damages for the children and the adults directly victimized by Defendants' outrageous conduct.

Plaintiffs' Second Amended Petition at 2–4.

At least twenty-one plaintiffs were patients in NME's hospitals in its Texas region while Cronen was regional administrator. One plaintiff was a patient in a NME hospital while Cronen was administrator there. Cronen is not named as a defendant in the case because, according to Baker & Botts, there is no basis for asserting that Cronen has any liability to plaintiffs. Baker & Botts asserts that no plaintiff knows Cronen or ever dealt with him. However, Cronen's immediate predecessor as regional administrator, Peter Alexis, is named as a defendant. (Wicoff was never involved in the operation of any of the hospitals in which plaintiffs were admitted, and he is not named as a party in the suit.)

NME moved almost immediately to disqualify Baker & Botts from representing plaintiffs on the ground that Tomko possessed information obtained from NME that he was obliged to treat as confidential and to which all Baker & Botts lawyers must be presumed to have access. Although plaintiffs did not sue Cronen, he nevertheless intervened to file his own motion to disqualify Baker & Botts on the ground that its representation of plaintiffs violated Rule 1.09 of the Texas Disciplinary Rules of Profes-

sional Conduct, which states in pertinent part:

(a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

. . . . .

(2) if the representation in reasonable probability will involve a violation of Rule 1.05; or

(3) if it is the same or a substantially related matter.

(b) Except to the extent authorized by Rule 1.10 [relating to former government lawyers], when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if anyone of them practicing alone would be prohibited from doing so by paragraph (a).

TEX.DISCIPLINARY R.PROF.CONDUCT 1.09, *reprinted in* TEX.GOV'T CODE, tit. 2, subtit. G app. (Vernon Supp.1996) (All references to rules in this opinion are to the Texas Disciplinary Rules of Professional Conduct.). The parties submitted evidence in the form of affidavits, and the district court heard argument of counsel.

The district court accompanied its ruling with an extensive opinion, which greatly assists us in considering the issues. Concerning NME's motion, the district court reasoned that the Baker & Botts lawyers who possessed NME's confidences could not be presumed to have shared them with other lawyers in the firm so as to disqualify the firm unless Baker & Botts (1) had actually represented NME, or (2) owed NME a duty of loyalty because of its representation of Cronen and Wicoff or the joint defense agreement, or (3) was actually misusing NME's confidences. Concluding that the first two conditions did not exist, and noting that NME had offered no evidence that its confidences had been misused, the district court denied NME's motion.

Concerning Cronen's motion, the district court concluded that the pending lawsuit is substantially related to the matters in which Baker & Botts represented Cronen, but that

this suit is not adverse to Cronen, and Baker & Botts' representation of plaintiffs will not in reasonable probability result in a misuse of Cronen's confidences. Accordingly, the district court denied Cronen's motion. The controversy among the parties centers on the issue of adversity, and so we set out the district court's findings and conclusions on this matter in more detail.

For guidance in determining the meaning of "adverse" in Rule 1.09(a), the district court looked to the definition of "directly adverse" in the related setting of Rule 1.06(b)(1), which provides that "... a lawyer shall not represent a person if the representation of that person ... involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm". Comment 6 to Rule 1.06 states:

> Within the meaning of Rule 1.06(b), the representation of one client is "directly adverse" to the representation of another client if the lawyer's independent judgment on behalf of a client or the lawyer's ability or willingness to consider, recommend or carry out a course of action will be or is reasonably likely to be adversely affected by the lawyer's representation of, or responsibilities to, the other client. The dual representation also is directly adverse if the lawyer reasonably appears to be called upon to espouse adverse positions in the same matter or a related matter. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not constitute the representation of directly adverse interests. Even when neither paragraph (a) [barring a lawyer from representing opposing parties to the same litigation] nor (b) is applicable, a lawyer should realize that a business rivalry or personal differences between two clients or potential clients may be so important to one or both that one or the other would consider it contrary to its interests to have the same lawyer as its rival even in unrelated matters; and in those situations a wise lawyer would forego the dual representation.

The district court concluded that an action against a former client would, as a matter of law, be adverse to the former client; that an action which did not fall within comment 6 to Rule 1.06 would, as a matter of law, not be adverse to the former client; and that anything in between, as the present case is, would be a question of fact. The court determined to resolve this question by considering all relevant, present circumstances, without regard to possible future changes in those circumstances. Among the factors the court found important were

> the likelihood that any detriment that would result to the former client from the current representation, the kind of detriment that would result to the former client from the current representation, the likelihood that client confidences from the prior representation would be used in the current representation, whether this particular potential conflict was or in the exercise of reasonable diligence should have been known, and whether this type of conflict in one that as a general matter could easily be discovered in the exercise of reasonable diligence.

(Footnote omitted.)

Cronen contends that vigorous prosecution of the pending lawsuit on behalf of plaintiffs who were patients in hospitals he administered is bound to develop evidence that could be used against him in civil or criminal actions. Baker & Botts responds that Cronen has denied all wrongdoing, that he has never been found to have engaged in any misconduct despite the numerous investigations and lawsuits involving NME's operations, that uncovering any new evidence now that would reflect badly on Cronen is highly unlikely, and that it has no intention of naming Cronen as a party in this litigation. The district court found:

> The Court finds that it is wrong to assume that prosecution of claims against NME and NME personnel other than Mr. Cronen inherently poses a significant risk to Mr. Cronen. The Court finds that the risk to Mr. Cronen from Baker & Botts' prosecution of this action is small given that he is not a defendant and is not even

alleged by any party to have committed any misconduct. Nonetheless, there is still some risk that Baker & Botts' diligent development of this case will bring to public light information adverse to Mr. Cronen that is not presently publicly known and that otherwise would have passed unnoticed to governmental or media investigations or other civil litigants with less available resources. Based on the current record, the Court finds that risk to be minimal, given the large volume of information presently known and the number of other parties investigating these subjects.

The Court finds that the kind of detriment to which Mr. Cronen could be subjected is serious, and includes possible criminal liability, as well as possible civil liability. While it seems likely that criminal prosecution of Mr. Cronen would already have commenced were it going to do so, the Court understands that some criminal investigations are still proceeding. Although no prosecutor has advised Mr. Cronen that he is a "target" of an investigation, that fact does not remove all risk of criminal prosecution.

The Court finds ... that Baker & Botts' representation of plaintiffs is not likely to result in the use of confidential information obtained in the course of representing Mr. Cronen. The Court finds that Baker & Botts was actually aware of this possible conflict at or before the time it undertook the representation of plaintiffs in this action. The Court also finds that this is a category of potential conflict—possible detriment to former client arising out of possible development of adverse facts during course of litigation to which former client is not a party—that generically would be difficult to discover and thus would make an imprudent basis for a prescriptive rule.

Based on the foregoing, the Court finds that Baker & Botts' representation of plaintiffs here is not "directly adverse" to Mr. Cronen within the meaning of Rule 1.06. That is, Baker & Botts' independent judgment on behalf of plaintiffs and Baker & Botts' ability or willingness to consider, recommend or carry out a course of action will *not* be and is *not* reasonably likely to be adversely affected by Baker & Botts' prior representation of, or responsibilities to, Mr. Cronen; nor does Baker & Botts reasonably appear to be called upon to espouse positions adverse to Mr. Cronen in this matter. Thus that representation cannot be adverse for purposes of Rule 1.09 since it does not meet the more protective standard of Rule 1.06. Without reference to Rule 1.06 or "directly adverse," the Court further finds that considering all of the surrounding facts and circumstances, together with all of the facts discussed above, Baker & Botts' representation of plaintiffs here is not adverse to Mr. Cronen for purposes of Rule 1.09.

The Court emphasizes that its findings on adversity are based on the present state of the pleadings and the record before the Court on discovery. If it should later develop that Baker & Botts in its prosecution of this action is developing substantial evidence that poses a specific threat to Mr. Cronen, the Court would certainly take that information into consideration in revisiting this ruling.

(Footnotes omitted.)

■ NME and Cronen seek review of the district court's rulings by mandamus. The court of appeals denied leave to file. We granted leave. 39 Tex. Sup.Ct. J. 20 (Oct. 27, 1995). To obtain mandamus relief, NME and Cronen must show that the district court's refusal to disqualify Baker & Botts as plaintiffs' counsel in the pending litigation was a clear abuse of discretion for which there is no adequate remedy by appeal. *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992). Accordingly, we consider whether the district court abused its discretion, first in denying NME's motion, and then in denying Cronen's. We hold that both should have been granted. We then consider whether NME and Cronen have an adequate legal remedy and conclude that they do not.

## II

To determine whether NME's disclosure of confidences to Tomko disqualifies Baker & Botts from representing plaintiffs in the pending action, we must first consider wheth-

er Tomko would be disqualified. Baker & Botts is not disqualified unless Tomko would be.

## A

■ The pending action is substantially related to the prior investigations and lawsuits involving NME and Cronen, as the district court found. The allegations throughout are identical in all material respects. *See Texaco, Inc. v. Garcia,* 891 S.W.2d 255, 257 (Tex.1995)(holding two distinct claims were substantially related due to the existence of similar liability issues, scientific issues, and defenses). Had Tomko represented NME in the same matters in which he represented Cronen and Wicoff, both he and Baker & Botts would be disqualified from representing plaintiffs in the pending action against NME. *See NCNB Texas Nat'l Bank v. Coker,* 765 S.W.2d 398, 399–400 (Tex.1989).

But Tomko did not represent NME, either by virtue of his representation of Cronen and Wicoff or otherwise. The joint defense agreement is quite clear on this subject:

> Each client member understands and acknowledges ... that he or she is represented only by his or her own attorney in this matter; that while the attorneys representing the other members have a duty to preserve the confidences disclosed to them pursuant to this agreement, they will not be acting as his or her attorney in this matter; and that the attorney representing the other client members will owe a duty of loyalty to their own respective clients only.

This does not mean, however, that under the joint defense agreement Tomko and other attorneys had no duty at all to non-clients. Tomko, like the other attorneys and clients participating in the joint defense, agreed to undertake "a duty to preserve the confidences disclosed". This did not preclude an attorney and client from acting in their own best interests, even to the point of using information disclosed by others in ways that conflicted with the others' interests. For example, the parties recognized that situations could arise in which it would become necessary for them to cross-examine each other in court. But Tomko and the other parties strictly promised not to disclose information shared in the joint defense with third parties under any circumstances. Thus, Tomko agreed that any communications from other participants in the joint defense were "confidential and ... protected from disclosures to any third party by the joint defense privilege, the attorney-client privilege and the work product privilege." *Cf. United States v. McPartlin,* 595 F.2d 1321, 1337 (7th Cir.1979)(discussing the joint defense privilege). Tomko agreed not to disclose any information he obtained "to any third party without the consent of the attorney member who disclosed the information in the first instance."

Tomko, by his own admission, obtained confidential information from NME's counsel, and NME has not consented to disclosure of this information. Could he represent plaintiffs in the pending suit against NME, consistent with his obligations under the joint defense agreement? We have not previously faced this question, but we think the answer is obvious: he could not. Even though Tomko never represented NME, he was admitted into its confidences with his pledge to preserve them. To honor this pledge, Tomko has taken precautions to keep the information he received from NME secret from any attorney at Baker & Botts who was not involved in representing Cronen and Wicoff, and specifically, from the attorneys representing plaintiffs in the pending case against NME. To represent plaintiffs himself, Tomko would be required to be equally cautious in keeping from them the confidences of an opposing party, thereby compromising his duty to represent plaintiffs vigorously. Tomko simply could not honor his obligations under the *joint defense agreement and,* at the same time, prosecute the pending claims against NME. Even if there were a way to do so, such conduct by an attorney would give a strong appearance of impropriety.

Every authority of which we are aware—they are few but venerable—concurs in this view. The circumstances in *Wilson P. Abraham Construction Corp. v. Armco Steel Corp.,* 559 F.2d 250 (5th Cir.1977)(per curiam)(before Goldberg & Fay, JJ., & Dum-

bauld, D.J.), were very similar to those here. An attorney who had represented one of several co-defendants in connection with a federal grand jury investigation of antitrust law violations in the rebar steel industry later sought to represent plaintiffs in a civil antitrust action against his former client's co-defendants. Although his former client was not a party to the civil action, the Fifth Circuit held that the attorney would be disqualified if he received confidential information from the defendants in the civil action during the joint defense of the criminal investigation. The court held

> that when information is exchanged between various co-defendants and their attorneys that this exchange is not made for the purpose of allowing unlimited publication and use, but rather, the exchange is made for the limited purpose of assisting in the common cause. In such a situation, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants. Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense.

*Id.* at 253. Although the court described the relationship between the attorney and his client's co-defendants as resembling an attorney-client relationship, that quasi-relationship was not the basis of the court's holding. Rather, the court based its disqualification analysis on a duty to preserve confidences implied in the circumstances of a joint defense. *Id.*; *see also* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 95–395 (1995). In the case before us, no implication is necessary; Tomko expressly assumed a duty to preserve NME's confi-

dences, despite the fact that it did not represent NME. Nor is there any question in this case, as there was in *Armco Steel*, about whether confidential information was shared. Tomko acknowledged obtaining confidences from NME. In *Armco Steel*, on remand, the district court found that the attorney's participation in the joint defense arrangement had been brief, that he had not received confidential information from the defendants in the civil action, and that an exchange of confidential information could not be presumed because the civil action was not substantially related to the criminal investigation. *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 1979–1 Trade Cas. (CCH) ¶ 62,569, 1979 WL 1614 (E.D.La. March 28, 1979).

In *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.)(Sprecher, C.J.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978), a law firm represented a trade organization of corporations in the oil and gas industry. The firm agreed to keep information obtained from association members in strict confidence. After the firm prepared a report on various aspects of the industry, including uranium production, it undertook representation of a plaintiff in an antitrust suit against three association members. Although the firm never represented the three defendants individually, but only the trade association to which they belonged, the court held that the firm was disqualified from representing the plaintiff in the suit against the members because confidential information the firm had received was directly related to the claims in the lawsuit. The court held that the firm had an obligation to association members even though it never represented them. The court observed that an attorney might be disqualified from suing non-clients in a number of situations:

> There are several fairly common situations where, although there is no express attorney-client relationship, there exists nevertheless a fiduciary obligation or an implied professional relation:
>
> .　　.　　.　　.　　.

... When information is exchanged between co-defendants and their attorneys in a criminal case, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants, even though that co-defendant is not the one which he represented in the criminal case. *Wilson P. Abraham Const. Corp. v. Armco Steel Corp.,* 559 F.2d 250 (5th Cir.1977)(disqualification case).

*Id.* at 1319; *see Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 750 (2d Cir.1981)("Disqualification will ordinarily be required whenever the subject matter of a suit is sufficiently related to the scope of the matters on which a firm represents an association as to create a realistic risk either that the plaintiff will not be represented with vigor or that unfair advantage will be taken of the defendant.").

In *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263 (7th Cir.1983)(Posner, J.), a lawyer was retained by a corporation's employee to structure a stock transaction between the employee and the corporation. The corporation provided the lawyer the confidential financial, sales and management information he needed and paid his bill. Later, the lawyer's firm undertook representation of one of the corporation's competitors in an antitrust suit against the corporation. Although it was not clear whether the firm had represented the corporation or its employee in the earlier transaction, the court held that the firm was disqualified from suing the corporation. *Id.* at 1267–1268. Whether the attorney had represented only the client and not the corporation was inconsequential; what mattered, as in *Westinghouse,* was that the corporation had furnished the attorney confidential information that the law firm was bound to protect. Having shown the attorney its confidences, the corporation "had a right not to see [the firm] on the opposite side of a litigation to which that data might be highly pertinent." *Id.* at 1269.

In each of these cases disqualification was based, not on the attorney's former represen-

tation of an opposing party, but on the attorney's duty to the party to preserve its confidences. Tomko assumed that duty to NME expressly, and he could not honor it and sue NME at the same time.

**B**

Given that Tomko could not represent plaintiffs in the pending case, the question remains whether the other attorneys in the firm of Baker & Botts are disqualified. NME has offered no evidence that Tomko has disclosed its confidences to the Baker & Botts lawyers representing plaintiffs. Those lawyers deny ever having had access to the information Tomko possesses, and Tomko has testified about the lengths he has gone to screen the information from being disclosed. The district court found "that there is no reasonable probability that Baker & Botts will knowingly or unknowingly" disclose confidential information in the course of its representation of plaintiffs in the pending case. We agree.

Still, if Tomko had represented NME, Baker & Botts would be disqualified from representing plaintiffs suing NME, irrespective of the evidence and the district court's finding. *Henderson v. Floyd,* 891 S.W.2d 252, 254 (Tex.1995)(per curiam); *see* Rule 1.09(b); *see also Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831, 834 (Tex.1994)(involving a paralegal). The attorney's knowledge is imputed by law to every other attorney in the firm. There is, in effect, an irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of other attorneys in the firm. One reason for this presumption is that it would always be virtually impossible for a former client to prove that attorneys in the same firm had not shared confidences. *Henderson,* 891 S.W.2d at 254. Another reason for the presumption is that it helps clients feel more secure. *Analytica,* 708 F.2d at 1266. Also, the presumption helps guard the integrity of the legal practice by removing undue suspicion that clients' interests are not being fully protected. The issue is whether this same presumption applies when, as in the present case, an attorney is obliged to preserve another's confi-

dences, not because the other was a client, but because the attorney promised to do so just as if the other had been a client.

■ We perceive no reason why the presumption should not apply. The attorney's duty to preserve confidences shared under a joint defense agreement is no less because the person to whom they belong was never a client. The attorney's promise places him in the role of a fiduciary, the same as toward a client. *Armco Steel,* 559 F.2d at 253; *Westinghouse,* 580 F.2d at 1319. The difficulty in proving a misuse of confidences, and the anxiety that a misuse may occur, is no less for the non-client. The doubt cast upon the integrity of the legal profession is the same in either situation. Because the reasons for the presumption apply equally in both situations, and there are no other bases for differentiating between them, we hold that an attorney's knowledge of a non-client's confidential information that he has promised to preserve is imputed to other attorneys is the same law firm.

It follows that NME's motion should have been granted. As the law allows no other ruling, denial of the motion was an abuse of discretion.

### III

■ Cronen's motion to disqualify Baker & Botts is premised on Rule 1.09. The Texas Disciplinary Rules of Professional Conduct do not determine whether counsel is disqualified in litigation, but they do provide guidelines and suggest the relevant considerations. *Henderson,* 891 S.W.2d at 254; *Spears v. Fourth Court of Appeals,* 797 S.W.2d 654, 656 (Tex.1990); *Ayres v. Canales,* 790 S.W.2d 554, 556 n. 2 (Tex.1990). Since the parties in this case confine their arguments to the rule, we direct our focus there.

We have quoted Rule 1.09 above. There is no question that it applies to Tomko, and perforce to Baker & Botts, in every particular save one. Tomko personally represented Cronen and Wicoff formally in matter substantially related to the pending action, and they have not consented to Baker & Botts' representing plaintiffs in that action. The

only question is whether the pending matter is adverse to Cronen (we omit further consideration of Wicoff, since he has not moved to disqualify Baker & Botts). Baker & Botts cannot be disqualified on Cronen's motion unless the answer is yes.

Rule 1.09 does not define "adverse", so the district court turned, correctly, we think, to the dictionary definition of the word, and to the definition of "directly adverse" in Rule 1.06, comment 6. The court applied those definitions to the evidence before it and found that: (1) "there is still some risk that Baker & Botts' diligent development of this case will bring to public light information adverse to Mr. Cronen that is not presently publicly known and that otherwise would have passed unnoticed to governmental or media investigations or other civil litigants with less available resources"; (2) "the kind of detriment to which Mr. Cronen could be subjected is serious, and includes possible criminal liability, as well as possible civil liability"; and (3) "the risk to Mr. Cronen from Baker & Botts' prosecution of this action is small given that he is not a defendant and is not even alleged by any party to have committed any misconduct", and the risk is "minimal, given the large volume of information presently known and the number of other parties investigating these subjects." These findings are well supported by the evidence, and we accept them, as of course we must. From them the district court concluded that the pending action is not adverse to Cronen (although the court expressed concern that this could change). The issue, then, is whether the small but serious risk to Cronen posed by the pending action makes it adverse to him.

We think it does, as a matter of law. Adversity is a product of the likelihood of the risk and the seriousness of its consequences. Here, the probability that Cronen will be affected by the prosecution of the pending litigation is small, but it is not nonexistent. Cronen was regional administrator of hospital in which plaintiffs were patients. Allegations of misconduct in the operation of the hospitals would naturally be expected to implicate him, but for the fact that he has already survived extensive investigations to

date. However, his immediate predecessor pleaded guilty to criminal charges and is a named defendant in the pending case. What has befallen his predecessor illustrates the seriousness of the consequences to Cronen if additional information is uncovered or further charges made. Even if Baker & Botts is correct that resolution of the pending case will leave Cronen unscathed, Cronen's anxiety that his former law firm is now vigorously advancing the same allegations that have swirled around him for so long is certainly understandable. The chances of being struck by lightning are slight, but not slight enough, given the consequences, to risk standing under a tree in a thunderstorm. Cronen is not likely to be struck by lightning in the pending case, even though he is in the midst of a severe thunderstorm, but he is entitled to object to being forced by his former lawyer to stand under a tree while the storm rages on.

The risk found by the district court makes the pending action adverse to Cronen. Therefore, the district court had no discretion but to grant Cronen's motion to disqualify Baker & Botts.

## IV

■ In the several cases in which we have granted mandamus relief to disqualify counsel we have not addressed the prerequisite that relief by appeal be inadequate. *Texaco*, 891 S.W.2d at 257; *Henderson*, 891 S.W.2d at 255; *Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 468 (Tex.1994)(per curiam); *Mauze v. Curry*, 861 S.W.2d 869, 870 (Tex.1993)(per curiam). This omission is attributable, not to oversight and certainly not to a view that inadequate appellate relief is not a prerequisite in disqualification cases, but to the obviousness of the issue. Plainly, NME is not required to simply hope that the pending case is concluded without disclosure of its confidences, nor is Cronen required to wait until any damage will have been done and will be irremediable. A new criminal investigation into Cronen's activities, sparked by discovery in the pending case, cannot be reversed on appeal of this case. Moreover, the injury to the legal profession from repre-

sentation by lawyers who are disqualified cannot be cured by appeal.

Baker & Botts argues that inasmuch as Cronen has intervened solely for the purpose of moving to disqualify Baker & Botts, the order on his motion could be severed from the pending case and made final, so that it could be appealed. The same argument can be made for the order on NME's motion, even though NME would remain a party to the case. Indeed, the same argument goes for all orders on motions to disqualify. While we require that procedure in some circumstances, *e.g.*, TEX.R.CIV.P. 76a, we do not do so here. We have found mandamus to provide a workable review mechanism for orders on motions to disqualify, and we see no reason to depart from it. This is not to say that appeal from a severed and therefore final order would be improper, only that relief can also be obtained by mandamus.

## V

We must add a brief word in response to the dissent.

Distilled of rhetoric, the dissent disagrees with us on two crucial points: whether Tomko's knowledge of NME's confidences must be presumptively imputed to Baker & Botts, and whether the adversity to Cronen is too slight to warrant disqualification. Besides saying why it disagrees, the dissent repeatedly generalizes that we have ignored evidence, reweighed evidence, and employed improper standards for mandamus review.

It does not appear to have occurred to the dissent that one can disagree about the legal conclusions to be drawn from certain facts without disagreeing about the facts themselves. We have cited and discussed all the evidence the dissent says is relevant. We have quoted and adopted the district court's fact findings. Our conclusions are based on the evidence and findings, not despite them. Our differences with the dissent should be over legal principles, not allegations of impropriety.

\*    \*    \*    \*    \*    \*

■ The district court's analysis of the issues was thorough and thoughtful. Never-

theless, we cannot defer to a lower court's judgment on matters of law. *Walker,* 827 S.W.2d at 840. For the reasons given, we conclude that Baker & Botts must be disqualified in the pending action. We are confident that the district court will promptly comply with our opinion. Our writ of mandamus will issue only if that confidence proves misplaced.

BAKER, J., files a dissenting opinion, in which ENOCH, J., joins.

BAKER, Justice, joined by ENOCH, Justice, dissenting.

The Court holds that the trial court abused its discretion by overruling NME's and Cronen's motions to disqualify Baker & Botts. In doing so, the Court exercises and abuses discretion it does not possess. Consequently, I respectfully dissent.

In holding the trial court abused its discretion in denying NME's motion the Court determines that, although Ed Tomko did not represent NME in any proceeding, because of the joint defense agreement an irrebuttable presumption applies imputing Tomko's knowledge to other members of Baker & Botts. In holding that the trial court abused its discretion in denying Cronen's motion the Court finds that a small but serious risk to Cronen posed by the pending action makes that action adverse to him as a matter of law, though he is not a party.

In my view, on the record before the trial court, the trial court did not abuse its discretion in overruling both NME's and Cronen's motion to disqualify Baker & Botts.[1] In the case of NME's motion, the Court employs a false premise to apply the irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of other attorneys in the firm and consequently in this case Baker & Botts should be disqualified. In the case of Cronen's motion, the Court departs from settled mandamus law, recasts the issue and reweighs the evidence to determine that al-

though Cronen is not a party to the litigation, it is adverse to him.

## I. APPLICABLE LAW

### A. DISQUALIFICATION OF ATTORNEYS

We look to the Texas Rules of Professional Conduct for guidance in determining whether the Court should disqualify an attorney from representing a party in litigation. *Henderson v. Floyd,* 891 S.W.2d 252, 253 (Tex.1995); *Spears v. Fourth Court of Appeals,* 797 S.W.2d 654, 656 (Tex.1990). Rule 1.09 is the applicable rule, and provides in part:

> (a) Without prior consent, a lawyer who personally has formally represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:
>
> \* \* \*
>
> (3) if it is the same or substantially related matter.
>
> \* \* \*
>
> (b) except to the extent authorized by Rule 1.10 [successive government and private employment], when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if anyone of them practicing alone would be prohibited from doing so by paragraph (a).

TEX.DISCIPLINARY R.PROF.CONDUCT 1.09 (1994), *reprinted in* TEX.GOV'T CODE ANN., tit. 2, subtit. G app. (Vernon Supp.1996) (STATE BAR RULES art. X, § 9).

The party moving to disqualify an attorney must prove: (1) the existence of a prior attorney-client relationship; (2) in which the factual matters involved were so related to the facts in the pending litigation; (3) that it creates a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary. *NCNB Tex. Nat'l. Bank v. Coker,* 765 S.W.2d 398, 400 (Tex.1989). If the moving party meets this burden, he is entitled to a conclusive presumption that confidences and secrets

---

1. Attached as an appendix to this dissent is a copy of the trial court's Amended Order on Mo-    tion to Disqualify.

were imparted to the former attorney. *Coker*, 765 S.W.2d at 400.

## B. MANDAMUS

Mandamus is an extraordinary remedy available only in limited circumstances. *Canadian Helicopters Ltd. v. Wittig*, 876 S.W.2d 304, 305 (Tex.1994); *Walker v. Packer*, 827 S.W.2d 833, 840 (1992). A court should issue a writ of mandamus only to correct a clear abuse of discretion or the violation of a legal duty when there is no other adequate remedy at law. *Canadian Helicopters*, 876 S.W.2d at 305; *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). The relator has the burden of showing an abuse of discretion as well as the inadequacy of appellate remedy. This burden is a heavy one. *Canadian Helicopters*, 876 S.W.2d at 305; *Lutheran Social Serv. Inc. v. Meyers*, 460 S.W.2d 887, 889 (Tex.1970).

The test for abuse of discretion is not whether, in the reviewing court's opinion, the facts present a proper case for the trial court's action. Rather, the question is whether the trial court acted without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). To determine whether there is an abuse of discretion, we review the entire record. *See Morrow v. HEB, Inc.*, 714 S.W.2d 297 (Tex.1986). The party challenging the trial court's decision must establish that the facts and law permit the trial court to make but one decision. *Johnson*, 700 S.W.2d at 917.

## C. ABUSE OF DISCRETION–STANDARD OF REVIEW

With respect to resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for that of the trial court. *Walker*, 827 S.W.2d at 839; *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41–42 (Tex.1989). The trial court's resolution of factual issues is entitled to deference in a mandamus proceeding. The reviewing court may not set the trial court's finding aside unless it is clear from the record that the trial court could reach only one decision. *Walker*, 827 S.W.2d at 839–40. The reviewing court may not reverse for an abuse of discretion merely because it disagrees with the trial court's decision if that decision was within the trial court's discretionary authority. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991).

However, review of a trial court's determination of the legal principles controlling its ruling is much less deferential. A trial court has no discretion in determining what the law is or applying the law to the facts. Thus, the trial court's clear failure to analyze or apply the law correctly is an abuse of discretion and may result in issuance of writ of mandamus. *See Walker*, 827 S.W.2d at 840; *Coker*, 765 S.W.2d at 400.

An appellate court may not deal with disputed factual matters in a mandamus proceeding. *Hooks v. Fourth Court of Appeals*, 808 S.W.2d 56, 60 (Tex.1991); *Dikeman v. Snell*, 490 S.W.2d 183, 187 (Tex.1973). An abuse of discretion does not exist if the trial court bases its decision on conflicting evidence and some evidence reasonably supports the trial court's decision. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). An abuse of discretion does not exist if some evidence in the record shows the trial court followed guiding rules and principles. *Morrow*, 714 S.W.2d at 298.

## II. NME'S MOTION TO DISQUALIFY

The trial court applied Rule 1.09 to NME's Motion to Disqualify Baker & Botts.[2] In connection with NME's motion, the trial court reasoned that the Baker & Botts lawyers who had received information from NME could not be presumed to have shared the information with other lawyers in Baker & Botts. Therefore, the trial court reasoned that Baker & Botts was not disqualified from representing the plaintiffs suing NME unless Baker & Botts (1) had actually represented NME, or (2) owed NME a duty of loyalty

---

2. The parties and the trial court relied on disciplinary Rule 1.09 as the guiding rule and principle to determine the motions to disqualify Baker and Botts, and the Court does likewise.

because of Tomko's representation of Cronen and Wicoff or because of the joint defense agreement or (3) was actually misusing NME's confidences. The trial court concluded that the first two conditions did not exist and noted that NME offered no evidence that Baker & Botts had misused its confidences. Therefore, the district court denied NME's motion.

To the contrary, the Court concludes that because Tomko received information from NME of the type that *if he represented the plaintiffs himself,* he could not honor his obligations under the joint defense agreement and at the same time prosecute the pending claims against NME. To do so would give a strong appearance of impropriety. Although the Court acknowledges the joint defense agreement, it ignores the agreement's terms as well as other evidence in the record that supports the trial court's denial of NME's motion.

First, the initial element of Rule 1.09 requires that Tomko personally formerly represent NME. *See* Rule 1.09(a); *Coker,* 765 S.W.2d at 400. It is undisputed that Tomko did not personally represent NME in the previous proceedings. Second, although acknowledging the joint defense agreement, the Court ignores the other parts of the agreement between Tomko, NME and others. NME agreed that it understood it was represented only by its own attorneys in the matter. NME agreed that while attorneys representing other parties to the agreement promised to preserve confidences disclosed, the other attorneys including Tomko, were not acting as NME's attorney. NME agreed that an attorney representing another party owed a duty of loyalty only to that attorney's client. Finally, NME agreed that attorneys representing other clients had the right and may have the obligation to take actions against NME's own interest. Third, although the Court acknowledges other evidence in the record, it ignores that evidence to conclude that Tomko could not honor his obligations under the joint defense agreement and at the same time prosecute the pending claims against NME.

The record shows that Tomko has not disclosed information he received from NME to any attorney at Baker & Botts who was not involved in representing Cronen. He has specifically kept that information from the attorneys at Baker & Botts representing plaintiffs in the underlying litigation. The record also shows that Tomko does not personally represent the plaintiffs in this case against NME. Consequently, although the facts conclusively show that Tomko has not violated the joint defense agreement and that Tomko does not personally represent any plaintiffs in the pending litigation, the Court still concludes that Tomko's conduct leads to a strong appearance of impropriety.

The Court relies on three federal cases to support its conclusion that the trial court abused its discretion by not disqualifying Baker & Botts. *See Wilson P. Abraham Const. Corp. v. Armco Steel Corp.,* 559 F.2d 250 (5th Cir.1977); *Westinghouse Elec. Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263 (7th Cir. 1983). None of these cases involved a written joint defense agreement with the provisions found in the agreement in this case. Also in *Analytica,* the attorneys had actually represented the adverse client. In my view, these facts distinguish the Court's authorities from this case.

It seems to me that the Court totally ignores the standard of review in mandamus proceedings. That is, it seems clear from the entire record that the trial court followed Rule 1.09 as a guiding rule and principle in overruling NME's motion to disqualify. The initial requirement for Rule 1.09 to apply, is a prior existing attorney-client relationship. *Coker,* 765 S.W.2d at 400. Here, that requirement does not exist. The trial court did not abuse its discretion in applying Rule 1.09 to the facts of this case. The record shows that NME specifically agreed Tomko owed no loyalty to it, that Tomko had the right to take action adverse to NME, and that Tomko had not breached the agreement prohibiting disclosure of information Tomko received from NME in the prior proceeding. We may not reverse for an alleged abuse of discretion merely because we disagree with the trial court's decision. *Buller,* 806 S.W.2d at 226.

We must give deference to the trial court's resolution of factual issues and cannot set that decision aside unless it is clear from the record that the trial court could have reached only one decision. *Walker,* 827 S.W.2d at 839–40. It seems to me that the Court completely ignores this standard of review. It does not give deference to the trial court's resolution of the factual issues.

The Court then proceeds to state that because Tomko could not represent the plaintiffs in the pending case[3] the other Baker & Botts attorneys are disqualified. The Court concedes that NME offered no evidence that Tomko disclosed NME's confidences to the Baker & Botts lawyers representing the plaintiffs. The Court concedes the Baker & Botts lawyers deny ever having access to information Tomko possesses. To overcome these concessions, the Court leaps to the premise—"still, if Tomko had represented NME, Baker & Botts would be disqualified for representing plaintiffs suing NME irrespective of the evidence and the district court's finding."[4] The Court then states the law imputes Tomko's knowledge to every other attorney in Baker & Botts. The majority then concludes "there is [if Tomko had represented NME] in effect, an irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of the other attorneys in the firm."

The Court then frames the issue as whether this same presumption applies here, when Tomko promised to preserve the confidences as if NME had been a client. The Court perceives no reason why the presumption should not apply. Based upon that perception, the Court holds that an attorney's knowledge of a non-client's confidential information which he has promised to preserve is imputed to other attorneys in the same law firm. Accordingly, the Court disqualifies Baker & Botts.

I cannot agree with the Court's premise, its presumption based upon the premise, and the conclusion the Court reaches. The irre-

buttable presumption arises only if the attorney had in fact represented the former client. *Henderson,* 891 S.W.2d at 254. Such is not the case here, as the Court concedes. Accordingly, because Tomko did not represent NME, the irrebuttable presumption does not arise. In my view, the Court's premise, perception and conclusion won't hold water.

In summary, because NME did not meet its burden to prove a prior attorney-client relationship, Rule 1.09 does not apply and the trial court rightly determined it did not. Because Rule 1.09 does not apply, NME does not receive the benefit of the irrebuttable presumption set up in *Henderson.* What does apply in this case are the provisions of the joint defense agreement and the undisputed evidence that Tomko has not violated the terms of that agreement. When we properly apply the mandamus standards of review, the trial court neither abused its discretion in the resolution of the factual issues before it, nor abused its discretion in applying the law to those facts.

### III. CRONEN'S MOTION TO DISQUALIFY

As in NME's motion, Cronen's motion to disqualify Tomko and Baker & Botts is based only on Rule 1.09. Again, the parties in the trial court confined their arguments to the rule and the Court focuses on the rule. The Court correctly states the only issue on Cronen's motion is whether the underlying suit is adverse to Cronen.

The Court acknowledges part of the evidence in the record. However, the Court limits its discussion of the trial court's findings to the "small but serious risk to Cronen that Baker & Botts' diligent development of the case would bring to public light information adverse to Cronen that is not presently known." The Court then frames the issue to be whether the small but serious risk to Cronen posed by the pending action makes it adverse to him. The Court concludes that this fact alone makes it adverse as a matter

---

3. This misstates the circumstances because Tomko does not personally represent the plaintiffs in this pending case.

4. Of course, this premise does not exist in this case so Baker and Botts' disqualification does not follow.

of law. The Court then holds the trial court abused its discretion by finding otherwise.

In my view, the way the Court frames the issue and reaches its conclusion is improper. The majority does nothing more than isolate a fact finding and reweigh the evidence by limiting its consideration of that single fact finding to decide that "as a matter of law" the pending action is adverse to Cronen. This Court does not have the authority to reweigh evidence. The Court's decision is contrary to the established standard of review in a mandamus case.

When we review a trial court order for abuse of discretion, we must review the entire record to determine if the trial court acted without reference to any guiding rules and principles. *Morrow,* 714 S.W.2d at 298. Under an abuse of discretion review, we do not review the trial court's resolution of factual issues under legal or factual sufficiency standards. *See Crouch v. Tenneco, Inc.,* 853 S.W.2d 643, 649 (Tex.App.—Waco 1993, writ denied). Here, the Court basically employs a no evidence standard of review. This is improper. Finally, in framing the issue and reaching its conclusion, the Court completely ignores the trial court's finding that "[w]ithout reference to Rule 1.06 or 'directly adverse' the [trial court] further finds that considering all of the surrounding facts and circumstances, together with all of the facts [the trial court discussed in its order], Baker & Botts' representation of plaintiffs here is not adverse to Mr. Cronen for purposes of Rule 1.09." The Court does not discuss or attack the trial court's conclusion of law. In my view, applying the proper standards of review for abuse of discretion, this Court cannot find, under the record here, that the trial court's conclusion of law is incorrect and that the trial court abused its discretion.

## IV. CONCLUSION

Again, this is a situation where the Court departs from established mandamus standards of review, and reverses a trial court because the Court disagrees with the trial court's decision. If the Court applies the correct standards of review, I believe we cannot find the trial court abused its discretion. Accordingly, I dissent.

## APPENDIX

KELLY A., *et al.,* Plaintiffs,

v.

NATIONAL MEDICAL ENTERPRISES, INC., *et al.,* Defendants.

### IN THE DISTRICT COURT

### DALLAS COUNTY, TEXAS

### 160TH JUDICIAL DISTRICT

Cause No. 94–10808–H

### *AMENDED ORDER ON MOTION TO DISQUALIFY*

Defendants National Medical Enterprises, Inc. and Psychiatric Institutes of America, Inc. n/k/a NME Psychiatric Hospitals, Inc. (collectively, "NME") and Intervenor Ron Cronen both move to disqualify plaintiffs' counsel, Baker & Botts, L.L.P. ("Baker & Botts"). The Court denies the motion to disqualify, primarily because Baker & Botts' current representation is not adverse to Mr. Cronen and NME has no standing to assert disqualification as there was no attorney-client relationship or other duty between Baker & Botts and NME that would support disqualification. This Order constitutes the Court's findings of fact and conclusions of law relating to the motion.[1]

Plaintiffs and others have claimed that NME and various of its employees engaged in a massive conspiracy or scheme to defraud. Baker & Botts previously represented Mr. Cronen, a former NME employee, in urging that he was not part of any such scheme. Baker & Botts now claims that plaintiffs were injured by that alleged conspiracy or scheme and, on plaintiffs' behalf, seeks recovery from NME and related individuals, but does not allege any involvement of Mr. Cronen. The metaphorical argument implicit in movants' position is that Baker & Botts is dropping bombs all around Mr. Cronen and cannot expect him to escape injury, so Baker & Botts' present representation of

---

**1.** Other defendants have recently joined in the motion. They have less or the same basis as NME to seek disqualification, and their motions are likewise denied.

plaintiffs is adverse to Mr. Cronen. Baker & Botts argues that such a superficial analysis is inappropriate and that a careful examination of all pertinent surrounding facts and circumstances would show that this action in fact is not adverse to Mr. Cronen. The Court agrees and so finds.

The Court further finds and concludes that NME, having instigated Baker & Botts' representation of Mr. Cronen because of NME's potential conflict with Mr. Cronen cannot urge disqualification of Baker & Botts because Baker & Botts is now adverse to NME. NME was never a client of Baker & Botts. NME's motion rests upon a presumption of sharing of confidences with a law firm, to which only former clients are entitled and which NME admits is factually incorrect here. NME admits that its confidential information disclosed during Baker & Botts' representation is not being used against NME in this case. NME cannot deny plaintiffs their choice of counsel on that basis.

## I. FACTUAL BACKGROUND

Movant Psychiatric Institutes of America, Inc., n/k/a NME Psychiatric Hospitals, Inc. ("PIA") operated several psychiatric hospitals. In 1994, PIA pleaded guilty to certain federal criminal charges of conspiring to violate and violating the Medicare anti-remuneration statute, which prohibits payments to obtain referrals of Medicare patients. 42 U.S.C. § 1320a–7b(b)(2). This conspiracy was also the subject of various criminal investigations and civil actions generally alleging that PIA engaged in an ongoing conspiracy to defraud by wrongly paying referral fees to obtain psychiatric patients and providing treatment to those patients that was designed to maximize payment from insurance rather than to provide what treatment was medically necessary; these proceedings and allegations generated considerable publicity. Due to the potential for conflict of interest, NME retained separate counsel for some of its employees in connection with some of those matters.

Ron Cronen was Administrator of Laurelwood Hospital, an NME–controlled psychiatric hospital, from July, 1987 to May, 1988; he was Regional Administrator of the Texas Region for Psychiatric Institutes of America, an NME subsidiary, from December, 1990 to November, 1991. In April or May, 1992, attorney Ed Tomko and his firm, Doke & Riley,[2] began representing Mr. Cronen in connection with various criminal and civil matters arising out of the NME conspiracy. Haynes & Boone, L.L.P., NME's outside counsel in some of those matters, referred Mr. Cronen to Mr. Tomko.[3]

Mr. Tomko's representation of Mr. Cronen included representing him in connection with the criminal investigation and representing him as a nonparty in connection with discovery in some civil lawsuits. Mr. Cronen to date has not been indicted and was not a party defendant in the civil actions in which Mr. Tomko represented him. Mr. Cronen was named as a defendant in some civil actions, in which Mr. Tomko did *not* represent him; he was subsequently dropped from those actions on terms that did not require payment of any money by Mr. Cronen. During the course of Mr. Tomko's representation of Mr. Cronen, Mr. Tomko participated in joint defense meetings with counsel for NME and other individual defendants. A written Joint Defense Agreement addressed certain aspects of the joint defense arrangement. At those meetings Mr. Tomko was privy to confidential information relating to NME's defense strategy.

In January, 1993, upon the dissolution of Doke & Riley, Mr. Tomko joined Baker & Botts' Government Contracts department, and not the Baker & Botts Trial Department. Mr. Tomko continued to represent Mr. Cronen sporadically until May, 1993. In May, 1993, Mr. Tomko and Baker & Botts withdrew from representing Mr. Tomko due to an unrelated potential conflict of interest. Mr. Tomko billed a total of $18,177.09 for his representation of Mr. Cronen, of which

**2.** Other attorneys were involved in the representation. For simplicity's sake, the Court will refer only to Mr. Tomko.

**3.** Mr. Tomko also represented a Dr. Wicoff on a similar basis; Dr. Wicoff is neither a movant nor party to this action and will not be discussed further. To the extent NME's motion also relies upon Mr. Tomko's representation of Dr. Wicoff, the same analysis, findings and conclusions given below would apply.

$674.09 was for services rendered after Mr. Tomko joined Baker & Botts. As detailed below, *see infra* Section II.B, Baker & Botts has put into place procedures designed to ensure that confidential information obtained during Mr. Tomko's representation of Mr. Cronen is not disseminated within the firm or used in this action.

This lawsuit is brought by Baker & Botts on behalf of seventy-two former patients at NME psychiatric hospitals located in Texas. It alleges a "fraudulent illegal scheme" that resulted in improper patient admissions and treatment in Texas psychiatric hospitals and elsewhere, and that NME, its hospitals, employees and medical personnel admitted patients "with no legitimate medical justification," "manipulated diagnoses," and paid "kickbacks to a network of referral doctors" in order to "reap the reward of insurance benefits." *See* Plaintiffs' Amended Petition ¶ 1. At least twenty-one of the plaintiffs were hospitalized at hospitals that Mr. Cronen supervised during the period Mr. Cronen was Regional Administrator of the Texas Region. One plaintiff was hospitalized at Laurelwood Hospital while Mr. Cronen was the Administrator there. This lawsuit names as defendants the NME entities to which Mr. Cronen reported, the hospitals that reported to Mr. Cronen, and the individual who preceded Mr. Cronen as Regional Administrator. *See* Plaintiffs' Amended Petition ¶¶ 3–17. Baker & Botts' pleadings do not name Mr. Cronen as a defendant or make any allegations of misconduct by Mr. Cronen.[4]

## II. MR. CRONEN'S MOTION TO DISQUALIFY

Mr. Cronen moves to disqualify Baker & Botts under Rule 1.09(a) of the Texas Disciplinary Rules of Professional Conduct.[5] That Rule provides in pertinent part:

(a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter rep-

resent another person in a matter adverse to the former client:

. . . .

(2) if the representation in reasonable probability will involve a violation of Rule 1.05; or

(3) if it is the same or a substantially related matter.

(b) Except to the extent authorized by Rule 1.10 [relating to former government lawyers], when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

TEX. DISCIPLINARY R. PROF. CONDUCT 1.09 (1989), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G. app. (Vernon Supp. 1993) (STATE BAR RULES art. X, § 9) [hereinafter cited as Rules].

It is undisputed that Baker & Botts had an attorney-client relationship with Mr. Cronen and that Mr. Cronen has not consented to Baker & Botts' present representation of plaintiffs in this action. Thus, the matters for determination are: whether Baker & Botts' present representation is adverse to Mr. Cronen, whether that representation would in reasonable probability involve a violation of Rule 1.05, whether this lawsuit is substantially related to Baker & Botts' representation of Mr. Cronen, and whether the mandatory disqualification of the firm in Rule 1.09(b) would apply under these facts. In making these determinations, the Court is aware that disqualification is a "severe remedy" that "should only be applied judiciously and with caution because it can be used as an instrument of harassment." *NCNB National Bank v. Coker*, 765 S.W.2d 398, 399 (Tex. 1989).

---

4. The background facts in this Section are substantially undisputed.

5. While the Rules themselves do not apply to disqualifications, *see* Rules Preamble: Scope ¶ 14, courts are instructed to consider them in ruling on such motions. *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex.1990); *Occidental Chemical Corp. v. Brown*, 877 S.W.2d 27, 30 (Tex.App.–Corpus Christi 1994, no writ).

## A. Is Baker & Botts Adverse to Mr. Cronen

Case law offers little help in defining "adverse." One certainly can postulate a spectrum of degrees of adversity: (a) opposing a party in litigation or in a transaction and trying to obtain money, property, or other relief from that party; (b) representing a party against another party in litigation or a transaction that is not directly adverse to the other party, but that may contain elements of conflict, such as co-defendants united in opposing the plaintiff but adverse in allocation of liability; (c) seeking a result in litigation that will directly and detrimentally affect a non-party's property or interests through, for example, collateral estoppel; (d) advocating a legal or factual position in litigation that, if adopted and applied in other proceedings, could detrimentally affect a non-party's property or interest; (e) advancing a position in litigation· that might develop facts inadvertently that could detrimentally affect a non-party's property or interest; (f) advocating a position in litigation or advancing an interest in a transaction to which a non-party is strongly opposed. This enumeration is not an exhaustive catalog, but simply illustrates some of the possibilities. "While obvious cases may again be found at either end of the spectrum, intermediate cases present difficult questions of judgment and discretion ...." 1 Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering § 1.9:202, at 306.1 (2d ed.Supp.1994) (noting the spectrum of adversity in the ABA formulation of Rule 1.09, which refers to "materially adverse").

Rule 1.09 contains no definition of "adverse." Absent a specific statutory definition, Courts are instructed to give words their ordinary meaning. Tex. Gov't Code Ann. § 312.002 (Vernon 1988). One dictionary defines "adverse" as:

1. unfavorable or antagonistic in purpose or effect: adverse criticism. 2. opposing one's interests or desire: adverse circumstances. 3. being or acting in a contrary direction: opposed or opposing: adverse winds. 4. opposite: confronting: the adverse page.

Random House Unabridged Dictionary (2d ed.1993). This definition does not seem materially useful in deciding disqualification.

Courts are also directed to look to similar statutory provisions or definitions. Cf. Tex. Gov't Code Ann. § 311.023(4) (Vernon 1988). Rule 1.06, dealing with concurrent representation, prohibits any representation that "involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm." Rule 1.06(b)(1). The comments define "directly adverse":

Within the meaning of Rule 1.06(b), the representation of one client is "directly adverse" to the representation of another client if the lawyer's independent judgment on behalf of a client or the lawyer's ability or willingness to consider, recommend or carry out a course of action will be or is reasonably likely to be adversely affected by the lawyer's representation of, or responsibilities to the other client. The dual representation also is directly adverse if the lawyer reasonably appears to be called upon to espouse adverse positions in the same matter or a related matter. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not constitute the representation of directly adverse interests.

Rule 1.06, comment 6. This definition is facially not applicable to Rule 1.09, though it does provide some guidance. Greater care and a higher standard are required when dealing with conflicts arising out of concurrent representations than with conflicts arising out of a former client. E.g., Phoenix Founders, Inc. v. Marshall, 887 S.W.2d 831, 836 (Tex.1994) ("The fact that the present case involves representation of adverse parties in the same proceeding, rather than two separate proceedings, increases the danger that some improper disclosure may have occurred."). By analogy, the degree of adversity required for disqualification under Rule 1.09(a) ought at least to rise to the level of "directly adverse" under Rule 1.06.

The Court concludes that seeking relief from a former client in litigation establishes adversity as a matter of law for purposes of Rule 1.09. The Court concludes that a degree of adversity less than "directly adverse" under Rule 1.06 as a matter of law would not establish adversity for purposes of Rule 1.09. The Court concludes that in between those two boundary points, the quanta of adversity required in Rule 1.09 is a question of fact.

In addressing that fact question, the Court will consider all the surrounding facts and circumstances. In deciding what factors are important in making that analysis, the Court should consider the overall goal and purpose of Rule 1.09. *Cf.* TEX. GOV'T CODE ANN. § 311.023(1) (Vernon 1988). Such factors include: the likelihood that any detriment that would result to the former client from the current representation, the kind of detriment that would result to the former client from the current representation, the likelihood that client confidences from the prior representation would be used in the current representation,[6] whether this particular potential conflict was or in the exercise of reasonable diligence should have been known, and whether this type of conflict is one that as a general matter could easily be discovered in the exercise of reasonable diligence. In considering these factors, the Court concludes that it should consider them based on the existing circumstances, and not based on possible changed circumstances in the future; i.e., on the current state of the pleadings what is the likelihood that any detriment would result to Mr. Cronen, and not whether it is possible that circumstances might change during the prosecution of this action in a manner that would increase the likelihood of detriment to Mr. Cronen. *Cf. Hydril Co. v. Multiflex, Inc.,* 553 F.Supp. 552, 556 (S.D.Tex.1982) ("A potential conflict based on potential issues is simply not the standard.")

Here, Mr. Cronen contends that Baker & Botts intends to show massive, systemic fraud and conspiracy at NME that involves all of the boxes on the organization chart surrounding Mr. Cronen, that involves his direct predecessor, that involves a patient at a hospital of which he was Administrator, and that involves many patients at hospitals under his supervision as Regional Administrator of the Texas Region. Mr. Cronen contends in essence that Baker & Botts' omission of him from its petition simply makes him an unindicted co-conspirator, and that once Baker & Botts is finished, if it is successful, taking the one extra step to get to Mr. Cronen would be trivial. He contends that regardless whether Baker & Botts is presently intending to pursue him directly, in pursing all those around him Baker & Botts will likely, if not inevitably, develop evidence that could be used subsequently against him in civil or criminal actions.

Baker & Botts notes that it is not presently pursuing any claims against Mr. Cronen in this lawsuit. Baker & Botts argues that one must look past Mr. Cronen's rhetoric and metaphors at the actual facts, which indicate that prosecution of plaintiffs' claims would not result in prosecution of Mr. Cronen. Baker & Botts essentially argues that one cannot assume any culpability on Mr. Cronen's part simply because people around or before him may have engaged in culpable conduct. Absent that assumption, Baker & Botts urges, there is not any indication that pursuing the claims in this lawsuit will have any detriment to Mr. Cronen and, to the contrary, all available evidence suggests that Baker & Botts' pursuit of its claims here would not harm Mr. Cronen. Baker & Botts notes: that the consistent position of Mr. Cronen and NME is that Mr. Cronen has committed no wrongdoing; that the vast amount of publicly available information about NME does not include any mention of allegations of wrongdoing by Mr. Cronen; that while Mr. Cronen was initially named as a defendant in 33 out of 55 civil actions in Tarrant County that NME identified as similar to this one, he was dismissed or nonsuited in all 33; and that no judgment has ever been entered against Mr. Cronen relating to the operation of any psychiatric hospital, and that Mr. Cronen has never paid to settle any

---

**6.** Considering this factor in determining adversity seems a bit of double counting, given its recurrence elsewhere in the rules, though it certainly is an important aspect of Rule 1.09. In this case, the Court's factual conclusions would be the same regardless whether this factor is included.

such claim. Thus, Baker & Botts argues, the facile assumption that pursuing claims against NME and others will result in judgments, damages, or indictment against Mr. Cronen has time and again proven incorrect.

Moreover, Baker & Botts claims, its pursuit of this action is not likely to uncover any information detrimental to Mr. Cronen that would not come to light in any event. Baker & Botts suggests that given the extensive media, litigation, and criminal investigations that have already taken place, most pertinent information is already available anyway. In NME's plea agreement with the federal government, moreover, *NME* has agreed to cooperate with the government and provide the government with any requested information and disclosure of "any credible evidence of misconduct that ... may constitute a violation of federal law regarding the operation or activities, past or present, of any psychiatric or substance abuse treatment facility owned or operated by NME." Plea Agreement. *United States of America v. NME Psychiatric Hospitals, Inc.*, Case No. 94–0268 (D.D.C. June 29, 1994), at 7. Finally, Baker & Botts notes, the parties have stipulated that Baker & Botts' present representation will not cause any state or federal criminal authority or any civil litigant to have access to documents they are not otherwise legally entitled to obtain.

In short, Baker & Botts argues that the record shows that prosecution of claims against NME and NME personnel does not pose a threat to Mr. Cronen, and to the extent Mr. Cronen is at risk, that risk is not increased by Baker & Botts' participation in this action.

The Court finds that it is wrong to assume that prosecution of claims against NME and NME personnel other than Mr. Cronen inherently poses a significant risk to Mr. Cronen. The Court finds that the risk to Mr. Cronen from Baker & Botts' prosecution of this action is small given that he is not a defendant and is not even alleged by any party to have committed any misconduct.

Nonetheless, there is still some risk that Baker & Botts' diligent development of this case will bring to public light information adverse to Mr. Cronen that is not presently publicly known and that otherwise would have passed unnoticed to governmental or media investigations or other civil litigants with less available resources. Based on the current record, the Court finds that risk to be minimal, given the large volume of information presently known and the number of other parties investigating these subjects.

The Court finds that the kind of detriment to which Mr. Cronen could be subjected is serious, and includes possible criminal liability, as well as possible civil liability. While it seems likely that criminal prosecution of Mr. Cronen would already have commenced were it going to do so, the Court understands that some criminal investigations are still proceeding. Although no prosecutor has advised Mr. Cronen that he is a "target" of an investigation, that fact does not remove all risk of criminal prosecution.

The Court finds, as discussed in greater detail below, *see infra* Section II.B, that Baker & Botts' representation of plaintiffs is not likely to result in the use of confidential information obtained in the course of representing Mr. Cronen.[7] The Court finds that Baker & Botts was actually aware of this possible conflict at or before the time it undertook the representation of plaintiffs in this action. The Court also finds that this is a category of potential conflict—possible detriment to former client arising out of possible development of adverse facts during course of litigation to which former client is not a party—that generically would be difficult to discover and thus would make an imprudent basis for a prescriptive rule.

Based on the foregoing, the Court finds that Baker & Botts' representation of plaintiffs here is not "directly adverse" to Mr. Cronen within the meaning of Rule 1.06. That is, Baker & Botts' independent judgment on behalf of plaintiffs and Baker & Botts' ability or willingness to consider, recommend or carry out a course of action will

---

7. As mentioned above, the Court's finding on adversity would be the same if this factor were not considered.

*not* be and is *not* reasonably likely to be adversely affected by Baker & Botts' prior representation of, or responsibilities to, Mr. Cronen; nor does Baker & Botts reasonably appear to be called upon to espouse positions adverse to Mr. Cronen in this matter. Thus that representation cannot be adverse for purposes of Rule 1.09 since it does not meet the more protective standard of Rule 1.06. Without reference to Rule 1.06 or "directly adverse," the Court further finds that considering all of the surrounding facts and circumstances, together with all of the factors discussed above, Baker & Botts' representation of plaintiffs here is not adverse to Mr. Cronen for purposes of Rule 1.09.

The Court emphasizes that its findings on adversity are based on the present state of the pleadings and the record before the Court on discovery. If it should later develop that Baker & Botts in its prosecution of this action is developing substantial evidence that poses a specific threat to Mr. Cronen, the Court would certainly take that information into consideration in revisiting this ruling.[8]

### B. Confidentiality of Information

Rule 1.09(a)(2) prohibits representations adverse to a former client "if the representation is reasonable probability will involve a violation of Rule 1.05." Rule 1.05 provides in pertinent part that a lawyer shall not "knowingly ... [u]se confidential information of a former client to the disadvantage of the former client after the representation is concluded unless ... the confidential information has become generally known."

Movants contend that the conclusive presumptions under Rule 1.09(a)(3), dealing with substantially related matters, also apply to Rule 1.09(a)(2). Thus, say Movants, no factual inquiry is required here. The Court concludes the conclusive presumptions do not apply to Rule 1.09(a)(2), for several reasons. First, if they did then Rule 1.09(a)(3) would be surplusage. Second, Comment 4 to Rule 1.09 provides that "[w]hether such a reasonable probability exists in any given case will be a question of fact." If it is a question of fact, it cannot be a conclusive presumption. Third, sound policies support a conclusive presumption if the two matters are substantially related; those policies are inapplicable if the matters are *not* substantially related, which is the area addressed by Rule 1.09(a)(2). Nonetheless, the drafters of the Rules certainly did not want to permit misuse of client confidences if the subsequent representation was not substantially related; thus Rule 1.09(a)(2) protects against such actual knowing misuse in unrelated matters.[9]

The Court finds as a fact that there is no reasonable probability that Baker & Botts will knowingly or unknowingly violate Rule 1.05. Mr. Tomko's representation of Mr. Cronen terminated more than a year before Baker & Botts began considering representation of plaintiffs in this action. Movants do not claim that any of the individual lawyers representing plaintiffs in this action have received or used any information obtained as a result of Mr. Tomko's representation of Mr. Cronen. Finally, Baker & Botts has effectively screened such information.[10] Accord-

---

**8.** Although this determination on adversity alone is sufficient to resolve Mr. Cronen's motion, the Court will address other issues to minimize any possible need for remand for further factual determinations in the event the Court is mistaken on the issue of adversity.

**9.** *See also* Tex. Comm. on Professional Ethics, Op. 501 (April 12, 1994) (no irrebuttable presumption with Rule 1.05); Rule 1.09, comment 8 ("a lawyer is not subject to discipline under Rule 1.05(b)(1), (3) or (4), however, unless the protected information is actually used. Likewise, a lawyer is not subject to discipline under [Rule 1.09] unless the new representation by the lawyer in reasonable probability would result in a violation of these provisions.").

**10.** Mr. Tomko has gathered all materials related to the representation of Mr. Cronen and Mr. Wicoff and has physically restricted access to them by others. Each Baker & Botts attorney and employee who was involved in the representation has been advised repeatedly, both orally and in writing, not to discuss the matter with anyone. Computerized information that arguably may have been confidential has been deleted. Movants essentially acknowledge the effectiveness of those steps in admitting they have no proof of any misuse of confidential information or violation of the Joint Defense Agreement. *See* Admission Nos. 8, 25, 30, 33.

ingly, the Court holds there is no basis for disqualification under Rule 1.09(a)(2).

### C. Substantial Relationship

The test for substantial relationship in Texas is set forth in *NCNB Texas National Bank v. Coker*, 765 S.W.2d 398 (Tex.1989):

> The moving party must prove the existence of a prior attorney-client relationship in which the factual matters involved were so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary. Sustaining this burden requires evidence of specific similarities capable of being recited in the disqualification order. If this burden can be met, the moving party is entitled to a conclusive presumption that confidences and secrets were imparted to the former attorney. In this manner, the movant is not forced to reveal the very confidences he wishes to protect.

*Id.* at 400 (citation omitted).[11]

The similarities here are patent. Both representations deal with allegations that there existed a single, pervasive conspiracy or scheme among NME, some of its employees, and others to defraud insurance companies and others by wrongly paying referral fees to obtain psychiatric patients and wrongly providing medical treatment to those patients that was designed to maximize payment from insurance rather than to provide what treatment was medically necessary. With respect to Mr. Cronen, the goal of Baker & Botts' representation was to show that he was not part of any such scheme, should it be found to exist; with respect to the instant action, the goal of Baker & Botts' representation is to show that the scheme does exist and plaintiffs were injured by the scheme.[12] In both representations, though, the alleged scheme was at the core of the representation. The Court

therefore finds that the two representations are substantially related.

Numerous Texas cases have found substantial relationship on a less direct connection. In *Texaco, Inc. v. Garcia*, 38 Tex. S.Ct.J. 172 [891 S.W.2d 255] (Jan. 12, 1995, orig. proc.), the Supreme Court found a substantial relationship between two distinct claims that adjoining land was polluted by leaching and/or improper disposal of petroleum byproducts. The two instances were completely distinct and involved two totally different geographic areas. Nonetheless, the Court found a substantial relationship due to the existence of similar liability issues, similar scientific issues, and similar defenses and strategies. *See also Clarke v. Ruffino*, 819 S.W.2d 947 (Tex.App.–Houston [14th Dist.] 1991, orig. proc.) (representation of client in refinancing property is substantially related to suit relating to alleged breach of joint venture agreement pertaining to purchase of the property); *Insurance Co. of North America v. Westergren*, 794 S.W.2d 812 (Tex. App.–Corpus Christi 1990, orig. proc.) (representation of surety on construction bond in litigation with subcontractors and others after problems developed in school construction project is substantially related to litigation between general contractor and surety including allegations relating to breach of duty of good faith by surety in the course of the prior lawsuits); *Home Insurance Co. v. Marsh*, 790 S.W.2d 749 (Tex.App.–El Paso 1990, orig. proc.) (representation of individual chiropractors defending malpractice claims was substantially related to representation of defendant insurance companies in class action by chiropractors alleging conspiracy by carriers to damage chiropractic business by wrongfully refusing payment of fees and disregarding opinions of chiropractors).

Baker & Botts makes two legal arguments concerning the substantial relationship test. First, it argues that Mr. Cronen, as a non-party, should be held to a higher standard of proof and must be required to show actual prejudice. The Court concludes that is

---

11. Though *NCNB v. Coker* preceded the Rules and is a Canon 9/appearance-of-impropriety case, courts have subsequently held it to be the standard under the Rules. *E.g., Phoenix Founders, Inc. v. Marshall*, 887 S.W.2d 831 (Tex.1994).

12. In making this ruling, the Court of course is merely noting the similarities of the issues in the two representations and does not in any way prejudge the truth or falsity of any of the allegations in dispute in the merits of this action.

wrong. Nothing in Rule 1.09(a) suggests that an attorney's ethical duties to a former client are lessened if the client is not a party to the subsequent action. Baker & Botts also claims that under these circumstances, the conclusive presumption of shared confidences should be rebuttable and has been rebutted. In support, Baker & Botts cites a recent cases addressing a non-lawyer. *See Phoenix Founders, Inc. v. Marshall*, 887 S.W.2d 831 (Tex.1994) (when paralegal switches firms, presumption is rebuttable). To date, the controlling authority in dealing with *attorneys* requires this Court to continue applying a conclusive presumption. *See Petroleum Wholesale, Inc. v. Marshall*, 751 S.W.2d 295, 299 (Tex.App.–Dallas 1988, orig. proc.) (Canon 9 case, irrebuttable presumption). Moreover, combining *NCNB v. Coker* with Rule 1.09(b) reaches the same result. Under *NCNB v. Coker*, Mr. Tomko is conclusively presumed to have received confidences, so he personally could not appear for plaintiffs in this action (but for the Court's determination on adversity in Section II.A). Therefore, under Rule 1.09(b), the entire firm would be disqualified (again, but for the Court's finding of no adversity).

In the event the Court is mistaken regarding the law on either of these issues, the Court further finds that Mr. Cronen cannot demonstrate actual prejudice and that any presumption of dissemination of confidences has been rebutted, for the reasons and based on the factual determinations stated in Section II.B, above.

### III.   NME's Motion to Disqualify

NME's motion to disqualify is unusual in two respects. First, NME was never a client of Baker & Botts. Second, and most striking, NME is not trying to protect against misuse of confidential information disclosed during the joint defense. NME would not need to establish a quasi-attorney-client relationship or fiduciary duty if that were all it sought: the Joint Defense Agreement itself prohibits actual use of confidential information shared during the course of the defense. *See* Joint Defense Agreement at ¶ 3. Indeed, NME does not complain of any actual use by Baker & Botts of information NME disclosed during the joint defense or of any breach of the Joint Defense Agreement. Thus, we have the peculiar circumstance of a litigant attempting to disqualify an opposing party's counsel based upon a presumption of shared confidences that is premised in law upon the existence of an attorney-client relationship that admittedly does not exist here and which presumption admittedly is wrong as a matter of fact.

NME cites no Texas authority for the proposition that it has standing to move to disqualify Baker & Botts under these facts. Rather it places substantial reliance upon *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250 (5th Cir.1977), and on subsequent cases following *Wilson*. In *Wilson*, an attorney who had represented one of several co-defendants in connection with a federal grand jury investigation later sought to represent plaintiffs in a subsequent civil action against his former client's co-defendants and to which his former client was not a party. The Court of Appeals wrote:

> The defendants persuasively argue that in a joint defense of a conspiracy charge, the counsel of each defendant is, in effect, the counsel of all for the purposes of invoking the attorney-client privilege in order to shield mutually shared confidences. We agree, and hold that when information is exchanged between various co-defendants and their attorneys that this exchange is not made for the purpose of allowing unlimited publication and use, but rather, the exchange is made for the limited purpose of assisting in the common cause. In such a situation, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants.

*Id.* at 253. NME claims that, on the authority of *Wilson*, it is a quasi-client of Baker & Botts and has standing to move to disqualify, or alternatively, that Baker & Botts owes NME a fiduciary duty which NME may enforce by compelling withdrawal.

In order to consider *Wilson*'s applicability to these facts, one key paragraph of the Joint

Defense Agreement in this case also must be considered:

Each client member understands and acknowledges by his or her signature hereto that he or she is represented only by his or her own attorney in this matter; that while the attorneys representing the other members have a duty to preserve the confidences disclosed to them pursuant to this agreement, they will not be acting as his or her attorney in this matter; and that the attorney representing the other client members will owe a duty of loyalty to their own respective clients only. Each client member further understands and acknowledges that the attorney members representing other client members have the right, and may well have the obligation, to take actions against his or her own interest, including but not limited to, advising their own client to cooperate with the government, generating and disclosing evidence or information to the government or other third parties (apart from the confidential disclosures pursuant to this agreement) and cross-examining other client members at trial or other proceedings. While the precise nature of each possible conflict that may arise in the future cannot be identified at the present time, each client member, after being informed of the general nature of the conflicts that might arise, also knowingly and intelligently waives any conflict of interest that may arise on account of this agreement, including specifically from an attorney member of this agreement, other than his or her own attorney, examining him or her at trial or any other proceeding relating to the above-captioned investigation.

*See* Joint Defense Agreement ¶ 6.[13] *Wilson* did not refer to any joint defense agreement containing anything resembling the quoted language.

In Texas law, an attorney-client relationship is contractual and results from the mutual agreement of the parties as to the na-

ture of the work to be undertaken and the compensation to be paid. What is required is that both parties explicitly or by their conduct manifest an intention to create the attorney-client relationship. *Insurance Co. of North America v. Westergren*, 794 S.W.2d 812 (Tex.App.–Corpus Christi 1990, orig. proc. [leave denied]). Even were *Wilson* binding on this Court, it would not give rise to an attorney-client relationship between NME and Baker & Botts. First, while *Wilson* may have determined that an implied attorney-client relationship arose out of the joint defense there, the Joint Defense Agreement here explicitly disclaims any attorney-client relationship between NME and Baker & Botts.[14] Second, the *Wilson* court does not actually hold that an attorney-client relationship arose, but simply notes that defendants persuasively argue that the situation is, in effect, as if one arose. The Court finds as a fact that no attorney-client relationship arose between NME and Baker & Botts and that NME is not entitled to disqualification on that ground. Finally, if no attorney-client relationship exists, Texas law does not recognize any quasi-attorney-client obligation. *INA v. Westergren, supra,* 794 S.W.2d at 815; *Thomas v. Pryor,* 847 S.W.2d 303, 305 (Tex.App.–Dallas 1992), *writ granted & judg. set aside by settlement,* 863 S.W.2d 462 (Tex. 1993).

NME next claims that the joint defense gave rise to a fiduciary duty that would support disqualification. "Where the underlying facts are undisputed, determination of the existence, and breach, of fiduciary duties are questions of law, exclusively within the province of the court." *Lacy v. Ticor Title Insurance Co.,* 794 S.W.2d 781, 787 (Tex. App.–Dallas 1990), *writ refused per curiam,* 803 S.W.2d 265 (Tex.1991) (per curiam opinion expressing disapproval of unrelated portion of Court of Appeals' opinion). The facts relating to NME's fiduciary duty claim are undisputed, excepting the degree of confidential information disclosed by NME to Mr. Tomko. For purposes of this motion, the Court will assume that NME's position is

---

**13.** The Joint Defense Agreement was drafted by NME's counsel, Haynes & Boone, L.L.P.

**14.** Were NME's position correct, there would also be an attorney-client relationship between Mr. Cronen and Haynes & Boone, L.L.P., which NME denies.

correct and that highly sensitive and broad disclosures were made.

"Fiduciary relation" applies to legal relations between parties, created by law or by nature of contract between parties, where equity implies confidence and reliance in consummation of purposes for which the relation was created. The expression of "fiduciary relation" is one of broad meaning, including both technical fiduciary relations and those informal relations which exist whenever one person trusts and relies upon another. In resolving the problem of the existence of a fiduciary relationship, we note that the problem is one of equity, and the circumstances out of which a fiduciary relationship will be said to arise are not subject to hard and fast rules.

*Id.* at 788 (citations omitted). *See also* Roy Ryden Anderson & Walter W. Steele, Jr., *Fiduciary Duty, Tort and Contract: A Primer on the Legal Malpractice Puzzle,* 47 SMU L. REV. 235, 242–43 (noting the varying definitions and theories of fiduciary relationship); *see generally* Tamar Frankel, *Fiduciary Law,* 71 CAL. L. REV. 795 (1983).

This Court does not understand *Wilson* to have held that as a matter of law every joint defense gives rise to a fiduciary duty. Rather, this Court understands *Wilson* to have held that, under the facts of that case and applying the standards of fiduciary relationships, the court there concluded as a matter of law that a fiduciary relationship had arisen. Here the facts are quite different. Paragraph 6 of the Joint Defense Agreement expressly disclaims any duty of loyalty. It also acknowledges that the lawyers for one co-defendant may take actions adverse to the interests of another co-defendant.[15] Other provisions of the agreement permit withdrawal on written notice, which terminates any duties under the agreement except to maintain past confidences shared under the agreement (¶ 7) and permit independent fact investigations that need not be shared among co-defendants and may be shared with third parties. (¶ 5)

The Court concludes as a matter of law under these facts that no fiduciary relationship arose between Baker & Botts and NME. The Joint Defense Agreement does not represent a relation of trust and confidence, but rather a relation of mistrust and lack of confidence, in which the parties feel the need to bind each other contractually to maintain shared confidences, and acknowledge not only the absence of any duty of loyalty, but also the right to turn coat and attack at any time without notice. Alternatively, if any fiduciary duty arose, it was a limited duty actually to maintain the confidences shared in the joint defense, *see Wilson, supra,* 559 F.2d at 253 (attorney for co-defendant "breaches his fiduciary duty if he later, in his representation of another client, is able to use this information"), and the Court concludes as a matter of law that Baker & Botts' current representation does not breach that duty. *See supra* Section II.B.

MOTION DENIED.

SIGNED this 30th day of March, 1995.

---

**15.** As indeed NME did in its plea agreement in which it agreed to help the government against the interest of its former co-defendants.