COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-386-CV

IN RE DANIEL SHARPLIN, JR. RELATOR

------------

ORIGINAL PROCEEDING

------------

MEMORANDUM OPINION
(footnote: 1)

------------

In one issue in his petition for writ of mandamus, Relator Daniel Sharplin, Jr. contends that the 
236th District Court of Tarrant County abused its discretion by denying Sharplin’s motion to disqualify the law firm Kelly, Hart & Hallman, P.C. (KHH) from representing real party in interest Southwest Environmental Services, Inc. (Southwest) in the underlying case when a KHH lawyer, Robert T. Stewart, as part of his past employment and pursuant to a joint defense agreement and the joint defense privilege, obtained confidential information in a prior case concerning matters substantially related to the matters raised in the underlying case.  Because we hold that the trial court abused its discretion by denying Sharplin’s motion to disqualify KHH, we conditionally grant the writ of mandamus.

 I.  
Background Facts

A
.  Stewart Represented Tanknology/nde International, Inc. 

(Tanknology) When Sharplin Was its President and Engaged in 

Confidential Communications with Sharplin in Connection with a Federal Prosecution of Tanknology
.

Sharplin worked for Tanknology and its predecessor company from 1991 to 2000, serving as president from 1995 to 2000.  He was a consultant to the company from 2000 to 2003.  During Sharplin’s association with the company, Tanknology was the largest underground fuel storage tank (UST) testing company in the United States.  While Sharplin was its president, Tanknology performed testing services on USTs, installed and monitored automatic tank gauges (ATGs), which monitor leaks in USTs and aboveground tanks, and provided compliance management services involving USTs.

In 1998, during Sharplin’s presidency, federal agencies began to investigate the Tanknology division that performed UST testing services.  Although Sharplin was not identified as a target of the investigation, he retained Haynes and Boone law firm to represent him personally.  Robert T. Stewart, who was with Baker Botts at the time, represented Tanknology.

During the course of the investigation and the pendency of the criminal case, Sharplin spent from five to sixty hours per week for about thirty months with Stewart, providing Stewart with information about 
“the following issues regarding [USTs] and aboveground storage tanks: applicable regulatory standards, regulatory enforcement, leak detection alternatives, third-party certifications, intrinsic safety for leak detection alternatives, regulatory compliance alternatives, quality control, and [his] management of Tanknology in keeping with [his] interpretation of these issues.”  Sharplin never gave anyone permission to disclose the confidential information he gave Stewart.
 Following the federal investigations, U.S. attorneys in ten federal districts in nine different states filed charges against Tanknology, alleging that it had performed false services at various federal facilities across the country.  In August of 2002, Tanknology, pursuant to a plea agreement, pleaded guilty to ten felony counts of presenting false claims and making false statements to federal agencies during Sharplin’s presidency.

B.  
Stewart Joined KHH, Which Later Appeared as Co-counsel for Southwest in the Underlying Suit Against Sharplin.

At some point after the Tanknology prosecution concluded in August of 2002, Stewart left Baker Botts and joined KHH.  Stewart had been a director with KHH for approximately two years when KHH appeared as co-counsel for Southwest in its underlying lawsuit against Sharplin.

C.  
Southwest Filed the Underlying Suit Against Sharplin.

In September 2001, Southwest, which manufactures and sells ATGs,
 entered into a sublicensing agreement with USTest, another underground fuel storage tank testing company controlled by Sharplin. 
 
The agreement gave Southwest either a limited or an exclusive right, depending on which party’s interpretation of the agreement is correct, to manufacture and sell a particular model of an ATG.  By early 2002, a dispute had arisen concerning the parties’ rights and obligations under the agreement.  A lawsuit was filed in Travis County, which the parties later resolved through a written settlement agreement.

The acrimony between Southwest and USTest continued, however, and in October 2003, Southwest, which was then only represented by Robert F. Bodoin, filed the underlying suit against Sharplin, USTest, and related defendants in Tarrant County, seeking, among other things, declaratory relief concerning its rights under the sublicensing and settlement agreements and alleging defamation, breach of contract, and tortious interference with business relations.

D.  
KHH Appeared as Southwest’s Co-counsel Shortly after the Underlying Suit Was Specially Set for Trial.

 

On July 8, 2005, the trial court specially set the case for trial on September 12, 2005.  Less than two months after notice of this special setting, on August 26, 2005, KHH appeared as co-counsel for Southwest. 
 After KHH appeared as Southwest’s co-counsel, the trial court postponed the September 12 setting and reset the case for trial on November 7, 2005.

E.  
Shortly after KHH Appeared as Southwest’s Co-counsel, 
Southwest’s Theory of the Case Began to Change. 

After KHH appeared as Southwest’s co-counsel, the focus of Southwest’s pleadings and discovery began to change.  Southwest for the first time asserted complaints involving regulatory compliance, safety, and quality control issues, accusing Sharplin—and the other defendants allegedly controlled by him—of criminal acts and disclosing evidence related to Sharplin’s prior employment with Tanknology, a convicted felon.  For example, on October 10, 2005, Southwest supplemented its discovery responses to allow its expert to talk about the defendants’ code violations and revealed information, such as that found in electronic mail, that Southwest had about Sharplin’s past as the president of 
Tanknology.
  Then, on October 19 and 21, 2005, Southwest deposed a customer of one of the defendants, asking questions concerning whether the ATGs sold by the defendants met local and state regulations, whether the ATGs worked as leak detection devices, and whether Sharplin had given the customer false information.  Later, on October 24, Southwest submitted its original exhibit list, including as trial exhibits various state laws, national fire codes, and municipal fire codes, some of which provide for the imposition of criminal penalties, including confinement.  On October 31, Southwest filed its fifth amended petition, alleging among other claims that Sharplin and the other defendants had failed “to use their best efforts to maintain the high reputation of USTest.”

F.  
Sharplin Discovered Stewart’s Association with KHH and

Requested That 
KHH 
Be Disqualified from Representing Southwest
. 

On or about October 24, 2005, Sharplin’s attorney learned that Stewart was a KHH director.  Upon learning of Stewart’s association with KHH, Sharplin asked Southwest to agree not to offer any evidence or jury argument concerning Tanknology, the Tanknology criminal matter, or theories related thereto.  Southwest, however, refused.
  On October 28, Sharplin requested in writing that KHH withdraw from the case.  KHH refused.  On November 1, Sharplin filed an emergency motion to disqualify KHH.

After a hearing, the trial court denied Sharplin's motion on November 4, 2005.  Later that same day,  Sharplin filed this petition for mandamus and an emergency motion seeking a stay of proceedings below.  On November 7, 2005, we granted the emergency motion and stayed all proceedings until further order of this court.

II.  Law and Analysis

In one issue, Sharplin contends that the trial court abused its discretion by denying his emergency motion to disqualify KHH from representing Southwest because Stewart obtained confidential information from Sharplin in the Tanknology case that concerns matters substantially related to matters raised in the underlying case.

A.  
Joint Defense Privilege

Sharplin's emergency motion to disqualify KHH is based on the joint defense privilege.

[T]he joint defense privilege is part of the attorney client privilege recognized in Texas Rule of Evidence 503.  Under subsection 503(b)(1)(C), the “joint-defense” privilege protects “confidential communications made for the purpose of facilitating the rendition of legal services . . . by the client or a representative of the client, or the client’s lawyer or a representative of the lawyer, to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein.”
(footnote: 2)

In an affidavit filed in support of his motion to disqualify KHH, Sharplin contends that he, Tanknology, and their respective lawyers entered into a joint defense agreement in which he agreed
 to provide information about the Tanknology matter “with the agreement that Tanknology and its lawyers would not disclose the information” without his consent.
  Southwest, however, objects to Sharplin’s affidavit on the ground that it is conclusory and, therefore, does not constitute competent proof of the agreement.
(footnote: 3)  We disagree. 

The relevant portions of Sharplin’s affidavit are set out below:

2. I was employed by Tanknology . . . from approximately 1991 to 2000.  From 1995 to 2000, I served as President of Tanknology.  From 2000 to 2003, I served as a consultant to Tanknology.  This affidavit is based on my knowledge as an employee, officer and consultant of Tanknology.

. . . . 

4. In approximately 1998, various branches of the federal government began an investigation of the division of Tanknology that performed tank testing services.

5. On August 29, 2002, Tanknology entered into a plea agreement in which it pled guilty to ten felony counts of presenting false claims and making false statements to federal agencies.

6. During the course of the federal investigation and through the negotiating and entering of the plea agreement, Tanknology was represented by Robert T. Stewart (“Stewart”) and Edward Tomko (“Tomko”).  At the time, Stewart and Tomko were partners in the law firm of Baker & Botts.  Stewart, who worked in Austin, was the Tanknology lawyer with whom I dealt . . . most often.  I recently learned that Stewart now is a shareholder in the Austin office of [KHH].

7. I was never charged with any criminal wrongdoing in connection with the government’s investigation into Tanknology, nor was I ever notified that I was a target of the criminal investigation.  However, I did retain my own counsel, Barry McNeil and Ronald Breaux of the Dallas office of Haynes & Boone.

8. During the course of the investigation and criminal case, Mr. Breaux and I worked extensively with Tanknology and their attorneys, Stewart and Tomko.  Over the course of approximately thirty months, I spent between approximately five to sixty hours per week with Stewart at his office, at which time I provided extensive confidential information to Stewart.  Specifically, I provided information to Stewart about the following issues regarding [USTs] and above ground storage tanks:  applicable regulatory standards, regulatory enforcement, leak detection alternatives, third party certifications, intrinsic safety for leak detection alternatives, regulatory compliance alternatives, quality control, and my management of Tanknology in keeping with my interpretation of these issues.

9. I provided this information under the protection of the joint defense privilege and a joint defense agreement that I and my counsel entered into with Tanknology and its counsel—the Baker & Botts firm, with the agreement that Tanknology and its lawyers would not disclose this information to anyone without my permission.  I have never given Stewart, Baker & Botts, or anyone else permission to disclose the information given to Stewart in confidence.

This affidavit does more than merely conclude that an agreement exists.  It contains underlying facts, such as the names of the parties, the time frame of the agreement, the information it covered, and the confidentiality clause, it is credible, and it is susceptible to being readily controverted.
(footnote: 4)  Moreover, Southwest has never attempted to controvert the affidavit.  Instead, Southwest has assumed for the purpose of its arguments on appeal that an agreement exists.  We, therefore, reject Southwest’s argument that the affidavit is conclusory and accept as true Sharplin's averments that a joint defense agreement exists between him and Stewart.
(footnote: 5)  Even assuming the absence of an express agreement, the Supreme Court of Texas made clear in 
Godbey
 that the implicit duty to protect the nonclient’s confidences is no less binding than a duty undertaken expressly.
(footnote: 6)
B.  
Test for Lawyer Disqualification

Whether KHH should be disqualified from representing Southwest in the underlying matter turns on whether Stewart could properly represent Southwest.  KHH is not disqualified from representing Southwest unless Stewart would be; if Stewart would be disqualified, then KHH must be disqualified as well.
(footnote: 7)  As the Supreme Court of Texas explained in 
Godbey
, 

There is, in effect, an irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of other attorneys in the firm.  One reason for this presumption is that it would always be virtually impossible for a former client to prove that attorneys in the same firm had not shared confidences.  Another reason for the presumption is that it helps clients feel more secure.  Also, the presumption helps guard the integrity of the legal practice by removing undue suspicion that clients’ interests are not being fully protected.
(footnote: 8)
 In 
Coker
, the Supreme Court of Texas explained how to determine when disqualification of counsel is proper:

[T]o prevent a motion to disqualify counsel from being used as a dilatory tactic, trial courts must strictly adhere to an exacting standard when considering such motions.   When contemplating whether disqualification of counsel is proper, the court must determine whether the matters embraced within the pending suit are 
substantially related 
to the factual matters involved in the previous suit.

The severity of the remedy requested requires the movant to establish a preponderance of the facts indicating a substantial relation between the two representations.  The moving party must prove the existence of a prior attorney-client relationship in which the factual matters involved were so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary.  Sustaining this burden requires evidence of specific similarities capable of being recited in the disqualification order.  If this burden can be met, the moving party is entitled to a conclusive presumption that confidences and secrets were imparted to the former attorney.  In this manner, the movant is not forced to reveal the very confidences he wishes to protect.  By proving the substantial relationship between the two representations, the moving party establishes as a matter of law that an appearance of impropriety exists.  Although the former attorney will not be presumed to have revealed the confidences to his present client, the trial court should perform its role in the internal regulation of the legal profession and disqualify counsel from further representation in the pending litigation.
(footnote: 9) 

In determining whether the factual matters in the pending suit are substantially related to the matters in the previous suit, the factual matters “do[] not need to be ‘relevant’ in the evidentiary sense . . . .  [They] need only be akin to the present action in a way reasonable persons would understand as important to the issues involved.”
(footnote: 10)
 [T]wo matters are “substantially related” . . . when a genuine threat exists that a lawyer may divulge in one matter confidential information obtained in the other because the facts and issues involved in both are so similar. . . . An actual disclosure of confidences need not be proven;  the issue is the existence of a genuine threat of disclosure because of the similarity of the matters.
(footnote: 11)

C.  
The Specific Similarities Between the Cases

The evidence at the disqualification hearing showed the following specific similarities between the factual matters involved in the Tanknology case, during the pendency of which Sharplin shared confidences with Stewart, and the factual matters involved in the underlying suit brought by Stewart’s law firm on behalf of Southwest against Sharplin:

1.  
Sharplin is a Dominant, Controlling Figure in the Operation of the Corporations Involved in the Prior Case and in the Underlying Case.

Sharplin was the president of Tanknology when Tanknology committed the criminal offenses for which it was convicted in the prior criminal case and during the federal investigation of those offenses.  He was still a consultant to Tanknology when Tanknology entered into the plea agreement.  Although he was never targeted by the investigation,  Sharplin was potentially liable for Tanknology’s criminal acts because of his role within the company.
(footnote: 12)
 Excerpts from Southwest expert Robert C. Scott’s electronic mail, produced to Sharplin after KHH entered the case as Southwest’s co-counsel,  include an article about the Tanknology offenses and the plea agreement that Mr. Scott forwarded to Southwest personnel. 
 Also included in the electronic mail excerpts is a reply from Mike Gibson, the president of Southwest, “This is the company that Dan Sharplin was president of and forced to resign from last year before buying USTest,” and a response from Mr. Scott, “So he done it, huh!”

In the underlying case, Southwest sued Sharplin individually and alleged that the remaining defendants are controlled by Sharplin.
  
Southwest’s arguments in the trial court show the focus on Sharplin and his character in the lawsuit:

[Trial Court]:  Is the defendant concerned that plaintiff is going to assert that the defendants are seeking to skirt the law with the -- the gadget in question in here just like they did with Tanknology? . . . 

[Sharplin’s counsel]:  I suspect, being the good advocates that I know them to be, I could hear it, here we go again ladies and gentlemen of the jury, Dan Sharplin is at it again.

[Southwest’s counsel]:  Your Honor, we have offered not to make that argument if they would withdraw this motion to no avail . . . .

[Trial Court]:  . . . . [W]hen you said you don’t intend to offer that, are you talking about in essence to what the Court said about skirting the law or avoiding --

[Southwest’s counsel]:  Correct.

[Trial Court]:  —that kind of thing?

[Southwest’s counsel]:  We believe . . . that the prior claims made against Tanknology by the federal government although arguably probative would probably be outweighed by . . . the prejudice, and . . .  there is not a sufficient enough nexus to . . . tie the two.

Southwest’s counsel continued, 

Your Honor, it is Mr. Sharplin’s contention that his desire to . . . protect the confidentiality of the documents . . . led him not to give us anything, not one jot or tittle of technology necessary to build this device.  It was his desire to maintain the good will of USTest.  That’s a bogus reason.  What he wanted to do was keep our $50,000 and give us nothing.

. . . . 

[Sharplin’s counsel]:  And the record will not pick up the forcefulness and the effectiveness that [Southwest’s counsel] just made those arguments about what Mr. Sharplin —

[Trial Court]:  I think you just established that.

2
.  Both Cases Involve Allegations of Wrongdoing by Sharplin-controlled Corporations in the Area of USTs, Testing, and Leak detection.

a.  
Fraud by Sharplin-controlled Corporations 

Is Alleged in Both Cases
.

Evidence at the disqualification hearing showed that
 Tanknology pleaded guilty to ten felony counts of presenting false claims and making false statements to federal agencies.  The criminal acts included violating “required test protocols” and submitting false data.

Further, articles that Southwest produced to Sharplin in discovery and listed as trial exhibits discuss allegations that Tanknology duped the government in its plea negotiations.  Specifically, 
an 
Austin Business Journal
 provides, 

The U.S. Attorney’s Office in Austin claims Tanknology misled federal investigators by luring them into levying the fines against a shell corporation and by using the bankruptcy process to shield Tanknology’s two moneymaking businesses.

. . . .

In court documents, Daniel Castillo, an assistant U.S. attorney in Austin, alleges that during the entire course of Tanknology’s criminal case, executives at the company led the federal government to believe that . . . the shell company was responsible for the crimes and that it was able to meet the terms of the negotiated plea agreement.

Castillo claims in court papers that federal investigators were misled throughout the criminal process and that the scheme to skirt the fines using the bankruptcy process was premeditated.

. . . . 

“Regardless of which Tanknology entity is ultimately responsible,” [Austin bankruptcy attorney Joseph Martinec] says, “the company already admitted that they cheated the government and taxpayers, so that fact could look bad in front of a jury.”

In the underlying case filed by Southwest, the live petition includes the allegation that “the Sharplin-controlled Defendants have used their corporate form to perpetrate a fraud.”  Additionally, excerpts from Southwest’s depositions of the defendants’ clients taken after KHH became Southwest’s co-counsel show that Southwest’s lawyers were focused on the issue of whether Sharplin defrauded his clients by telling them that the ATGs would test for leaks and that they had a third-party certification attesting to their safety, such as an Underwriters Laboratory Listing.  Here, for example, are some excerpts from Eugene Clancy’s deposition:

Q. . . . [Y]ou paid $3900.00 times 70 for a product that doesn’t work.  Is that a fair statement?

. . . .

Q. If my calculations are correct, you paid almost $300,000 to Site Controls for a product that gives you very little information; is that correct?

. . . .

Q. Okay. . . . [W]as it represented to you by Dan Sharplin or anyone associated with Site Controls that the ATG . . . would be capable . . . of doing a leak detect test?

. . . .

Q. . . . .  Have you ever placed an order based upon someone’s representation from Site Controls or any other company that you know is associated with Dan Sharplin . . . that the [ATG] which you were ordering would satisfy . . . compliance requirements to do a leak detection test?

. . . . 

Q. . . . .  Do you know whether or not the [ATGs] and the electrical apparatus that have been installed . . . by Site Controls or any entity related to Dan Sharplin has ever received an Underwriters Laboratory listing?

Q. . . . .  When you first allowed the installation in 2003 of any Site Control [ATG] in an [UST], did you understand that the [ATG] had Underwriters Laboratory listing status?

. . . . 

Q. And by “they” told you it did, would that be Dan Sharplin or someone associated with him?

A. That’s correct.

Q. Who, other than Dan Sharplin, may have told you that it had Underwriters Laboratory listing status, the [ATG]?

A. I couldn’t be certain of where I heard it at.

. . . . 

Q. Okay.  And would the most likely person that you asked that question [of] have been Dan Sharplin?

A. I would say yes.

Q. Okay.  And when . . . you asked . . . whether or not the [ATG] manufactured by Site Controls met all the requirements to go in an . . . [UST], was . . .  the answer that you received “yes”?

A. Yes.

Q. Okay.  Now, have you ever learned from any source that, in fact, the [ATG] manufactured by Site Controls does not have . . . Underwriters Laboratory listing status?

. . . .

Q. Okay.  Now, did anyone ever tell you that the Site Controls [ATG] had third-party certification?

. . . .

Q. Is . . . that [exhibit 2 at the deposition] what you understand to be the third-party certification for the [ATGs] manufactured by Site Controls?

A. Yes.

Q. Was that furnished to you by Dan Sharplin . . . ?

A. Yes, I believe so.

Q. Is there any person other than Dan Sharplin that could have furnished Exhibit 2 to you?

. . . . 

Q. Okay.  And is . . . it your best recollection today that you asked him for proof of the . . . third-party certification of the Site Controls manufactured [ATG] and that he furnished you Exhibit 2 in response?

A. Yes.

. . . . 

Q. . . . .  Will you tell us whether . . . you believed, upon receipt of Exhibit 2, that the third-party certification given by Ken Wilcox for the Site Controls manufactured [ATG] carried with it the fact that the [ATG] manufactured by Site Controls had a listing with Underwriters Laboratory?

. . . . 

Q. Okay.  And the person who led you to that belief was who?

A. I would say Dan Sharplin.

The following exchange between KHH counsel and the trial court also shows that both the Tanknology case and the underlying case involve fraud allegations:

[KHH:] Here, the criminal entity, Tanknology, who was represented by Baker & Botts when Mr. Stewart was there . . . , engaged in the simple illegal practice of filing false claims with the federal government, claiming they had done work that they did not do.

Now, as I heard [Southwest’s counsel] describe what’s involved in this case, that has absolutely nothing to do with those matters that happened some years ago.  And —

[The Court]: Plaintiffs are going to allege simple little fraud in this one?

[KHH:] Well, not as simple as that fraud was.  Not as simple as just simply filing false claims claiming you did work that you didn’t do.  I mean, that’s about as simple a fraud [as] you can get when you’ve got multiple felony counts on you.

b.  
Criminal Behavior of Sharplin-controlled 

Corporations Is at Issue in Both Cases.
 

After KHH appeared as co-counsel, Southwest 
placed on its trial exhibit list an article from 
CSP Daily News Flash
 that contains information about Tanknology’s offenses and plea bargain.  Specifically, the article provides that Tanknology agreed to plead guilty to ten felony counts of presenting false claims and making false statements to federal agencies, to pay a $1 million criminal fine, and to pay $1.29 million in restitution.  The article also provides that Tanknology would be on probation for five years and would” implement a quality management system to ensure that false and improper testing practices do not occur again.”  Before the agreement, the corporation had “failed to implement quality assurance that could have prevented invalid testing practices.”

In the underlying case, Southwest placed certain sections of the water code on its trial exhibit list that describe offenses and criminal penalties related to Southwest’s allegations about Sharplin’s misconduct.  One section, section 7.148, provides that a person commits an offense if he “intentionally or knowingly tampers with, modifies, disables, or fails to use pollution control or monitoring devices, systems, methods, or practices . . . .”
(footnote: 13)  Another of the listed sections, section 7.149, provides that a person commits an offense if he “intentionally or knowingly makes or causes to be made a false material statement, representation, or certification in, or omits or causes to be omitted material information from, an application, notice, record, report, plan, or other document, including monitoring device data, filed or required to be maintained by Chapter 26 or by a rule adopted or a permit or an order issued by the appropriate regulatory agency under Chapter 26.”
(footnote: 14)  Finally, another listed section, section 7.187, provides the range of punishment, including confinement of up to thirty years.
(footnote: 15)
 At the hearing, Southwest’s counsel explained the importance of Tanknology’s criminal activities and the alleged criminal activities of Sharplin and corporations currently controlled by him to the underlying civil case:

We believe that the prior claims made against Tanknology by the federal government although arguably probative would probably be outweighed by the . . . prejudice, and . . . there is not a sufficient enough nexus to . . . tie the two.  . . . The thrust of our argument is this[:]  that Dan Sharplin and his entities have breached the sublicensing agreement from the outset and . . . in sundry different ways.  

The primary -- [o]ne of the ways, and only one of them, is that the sublicensing agreement obligated USTest to use its best efforts to maintain the high reputation of the USTest 2001 [ATG].  The defendant is making a product that utilizes the exact same [ATG], data card, [and] circuit board [and] uses the exact same probe and [is] installing [it] unlawfully in tanks without any . . . listing whatsoever from any approved regulatory agency.  . . .

. . . [A]ll of those tanks, all of the gauges that they have installed throughout Texas and Oklahoma . . . and throughout the west . . . do not comply with the fire codes.  Their own expert admits that.  And that’s . . . the regulatory violation that . . . exists.

As Sharplin’s counsel pointed out in the hearing, the statutes that Southwest included in its trial exhibits discuss criminal penalties including incarceration.  And, as Sharplin’s counsel argued in the hearing, 

[F]rom Mr. Sharplin’s perspective, . . . if you consider that Mr. Stewart is sitting at this table and cross-examining Mr. Sharplin on . . . what he did with this product, . . . and how he considered -- how he construes the water code, whether he thinks he’s in big trouble with that[, y]ou have to assume that Mr. Stewart has all kinds of knowledge about how Mr. Sharplin thinks, how he views things, how he views these particular statutes at issue.

3
.  Both Cases Focus on the Danger That the Activities of the Sharplin- controlled Corporations Could Result in Explosions.

An 
American-Statesman
 article from Southwest expert Scott’s electronic mail, produced by Southwest in discovery after KHH appeared as Southwest’s co-counsel, explains that the tests performed by companies such as Tanknology “check for leaks that can cause health and environmental risks, such as contamination of soil and ground water, and can potentially lead to explosions.”

The 
CSP Daily News Flash
 article produced by Southwest in discovery and included on Southwest’s trial exhibit list submitted after KHH appeared as co-counsel associates Tanknology’s offenses with risks to the public.  Specifically, the article includes a quotation from former EPA Administrator Christie Todd Whitman, “Compliance with the . . . requirements is dependent upon accurate information.  Those who knowingly place the public and environment at risk by false testing must and will be prosecuted.  False testing at [UST locations] presents grave risks and is unacceptable,” and a quotation from Tom Sansonetti, Assistant Attorney General of the Justice Department’s Environment and Natural Resources Division, “Tanknology was prosecuted and has been held responsible for fraudulent practices that could cause a risk of significant environmental harm at federal facilities.”

In the underlying case, Southwest’s counsel spoke at the hearing about the danger of explosions in connection with the allegations levied against Sharplin and Sharplin-controlled corporations in Southwest’s petition:

[T]he sublicensing agreement obligated USTest to use its best efforts to maintain the high reputation of the USTest 2001 [ATG].  The defendant is making a product . . . and installing [it] unlawfully in tanks without any . . . listing whatsoever from any approved regulatory agency.  It could blow them up.  That could hardly be considered using the best efforts to maintain the good will. . . .  That’s the safety issue here.

. . . [A]ll of those tanks, all of the gauges that they have installed throughout Texas and Oklahoma and . . . throughout the west . . . do not comply with the fire codes.  . . . [O]ne blow[] up, one explosion of these gauges using the same USTest 2001 technology could hardly . . . benefit either party.

III.  
The Trial Court Abused its Discretion by Not Disqualifying
 KHH.

Based on our analysis of the issues involved in both cases, we hold that there are sufficient similarities between the factual matters involved in the Tanknology case and those involved in the underlying case such that a reasonable person would believe that the issues involved in the Tanknology case are important to the issues involved in the underlying case.
(footnote: 16)  At the hearing, Southwest’s own counsel recognized that the prior claims made against Tanknology by the federal government are “arguably probative” to the claims made by Southwest against Sharplin in the underlying case.  As demonstrated above, the similarities between the two cases are clearly specific enough to be recited in a disqualification order.
(footnote: 17)
 The Tanknology case involved claims that a Sharplin-controlled company committed fraud, broke criminal laws, and put people at risk of explosions by not performing the testing required to prevent leaks.  After KHH appeared as Southwest’s co-counsel in the underlying lawsuit, it too has evolved into a case in which Sharplin and Sharplin-controlled defendants have been accused in one form or another of fraud, violating criminal laws, and putting the public at risk by failing to perform the testing required to prevent leaks.  At the hearing on Sharplin’s motion to disqualify KHH, Southwest’s counsel openly acknowledged that he and KHH contemplated arguing that Sharplin was attempting to “skirt the law” in its dealings with Southwest just like he did with Tanknology.  Under these facts, the trial court had no discretion to allow KHH to continue representing Southwest, and, therefore, we hold that the trial court abused its discretion by not disqualifying KHH.

IV.  
Miscellaneous Arguments Raised by Southwest

We reject Southwest’s contentions that Sharplin filed his motion to disqualify KHH as a dilatory tactic and that the motion was untimely filed, thereby waiving the complaint.  Sharplin’s counsel represented to the trial court at the hearing that he first learned that Stewart was with KHH on or about October 24, 2005, less than two months after KHH’s initial appearance as Southwest’s co-counsel.  Within eight days of learning the information, Sharplin’s counsel had a telephone conversation with KHH about the issue, requested in writing that KHH withdraw from the case, and filed an emergency motion to disqualify KHH.  Further, we do not see how the evidence that Southwest points to regarding alleged dilatory tactics 
before
 KHH appeared as counsel for Southwest could be pertinent to this issue.

Finally, we reject Southwest’s argument, based on 
Metropolitan Life Insurance Company v. Syntek Finance Corporation
,
(footnote: 18) that information in the public domain, such as most of the material in the Tanknology exhibits and all the relevant code provisions, cannot support disqualification.
(footnote: 19)  It is not the information in the articles or the elements of the statutes that have the potential to harm Sharplin.  Rather, it is the information and elements coupled with Sharplin’s confidences to Stewart about “the . . . issues . . . and [his] management of Tanknology in keeping with [his] interpretation of these issues” that have the potential to cast Sharplin in the same unflattering light as the felon he once controlled. 

V.  Conclusion

We lift our stay of all proceedings below and conditionally grant a writ of mandamus directing the trial court to vacate its November 4, 2005 order denying the motion to disqualify KHH and to render an order disqualifying KHH from further participation in the underlying case.  We are confident that the trial court will do so in a timely manner; our writ will issue only if the trial court does not.

LEE ANN DAUPHINOT

JUSTICE

PANEL A: CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  August 3, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
In re Skiles
, 102 S.W.3d 323, 327 n.2 (Tex. App.—Beaumont 2003, orig. proceeding); 
see also United States v. McPartlin, 
595 F.2d 1321, 1337 (7th Cir.) (cited in 
Nat’l Med. Enters., Inc. v. Godbey
, 924 S.W.2d 123, 129 (Tex. 1996) (orig. proceeding)), 
cert. denied
, 444 U.S. 833 (1979);
 In re Monsanto
, 998 S.W.2d 917, 922 (Tex. App.—Waco 1999, orig. proceeding).

3:
See 
Ghidoni v. Stone Oak, Inc.
,
 966 S.W.2d 573, 579 (Tex. App.—San Antonio 1998, pet. denied) (op. on reh’g) (en banc) (
holding that “the movant [in a disqualification hearing] may not rely upon conclusory statements but must ‘provide the trial court with sufficient information so that it can engage in a painstaking analysis of the facts.  While a movant need not divulge any confidences, he must delineate with specificity the subject matter, issues and causes of action presented in (the) former representation’”) (citations omitted).

4:
See Ryland Group, Inc. v. Hood
, 924 S.W.2d 120, 122 (Tex. 1996) (providing that a conclusory statement is not credible or susceptible to being readily controverted);
 Rizkallah v. Conner
, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st
 Dist.] 1997, no writ) (providing that a conclusory statement does not contain the underlying facts to support it); 
see also
 
NCNB Tex. Nat’l Bank v. Coker, 
765 S.W.2d 398, 400 (Tex. 1989) (providing that the movant seeking disqualification is not required to reveal specific confidences involved in the conflict).

5:
See 
Tex. R. App. P.
 38.1(f) (“In a civil case, the court will accept as true the facts stated unless another party contradicts them.”).

6:
See Godbey
, 924 S.W.2d at 130-31.

7:
See id.
 at 128-29.

8:
Id.
 at 131.

9:
765 S.W.2d at 399-400 (citations omitted); 
see also 
Tex. Disciplinary R. Prof'l Conduct
 1.09(a)(3), 
reprinted in
 
Tex. Gov't Code Ann.
, tit. 2, subtit. G app. A (Vernon 2005) (Tex. State Bar R. art. X, § 9) (providing that absent consent, a lawyer shall not represent a party adverse to a former client in “the same or substantially related matter”).

10:
In re Corrugated Container Antitrust Litig.
, 659 F.2d 1341, 1346 (5th Cir. 1981), 
overruled on other grounds
 
by
 
Gibbs v. Paluk
, 742 F.2d 181 (5th Cir. 1984); 
Ghidoni
, 966 S.W.2d at 602.

11:
In re Epic Holdings, Inc.
, 985 S.W.2d 41, 51 (Tex. 1998) (quoting
 Texaco
,
 Inc
.
 v
.
 Garcia
, 891 S.W.2d 255, 256 (Tex. 1995)).

12:
See Godbey
, 924 S.W.2d at 124 (“A corporation acts only through its human agents, but its liability for their misconduct does not absolve the agents from individual liability.”).

13:
Tex. Water Code Ann.
§ 7.148 (Vernon 2000).

14:
Id.
 § 7.149.

15:
Id.
 § 7.187.

16:
See Corrugated Container Antitrust Litig.
, 659 F.2d at 1346; 
Ghidoni, 
966 S.W.2d at 602.

17:
See
 
Coker
, 765 S.W.2d at 400.

18:
881 S.W.2d 319 (Tex. 1994).

19:
See id.
 at 321.